

**U.S. Department of Justice**

Criminal Division

---

*Fraud Section*                                                    *Washington, D.C. 20530*

June 13, 2021

The Honorable Jane Triche Milazzo
United States District Judge
Eastern District of Louisiana
500 Poydras Street
Room C206
New Orleans, Louisiana 70130

Dear Judge Milazzo,

Counsel for the government believes defendant Scott has offered evidence for which the government must offer evidence in rebuttal. First, defense counsel has on several occasions solicited witness testimony indicating that defendant Scott has not improperly seized or used arrestee property. The government should be allowed to rebut this false impression by presenting testimony of specific instances in which defendant Scott did in fact improperly seize and hold the property of a detained individual. Second, defense counsel has on several occasions solicited witness testimony that the practice of leaving the personal property of arrestees in or on desks in law enforcement spaces is common and acceptable. The government should be allowed to present rebuttal testimony indicating that defendant Scott has been specifically counseled and reprimanded for such evidentiary lapses. Third, defendant Scott has suggested that violations of DEA evidentiary policies are minor, common issues that should be handled with administrative reprimands. The government believes that this is a jury nullification argument and thus requests a curative instruction.

In anticipation of these issues, the government filed appropriate pre-trial Motions in Limine to prevent this testimony. Early in this case, the government filed an Omnibus Motion in Limine (Rec. Doc. 139) and a Motion in Limine to Exclude Evidence of Good Character (Rec. Doc. 140). On December 20, 2018, the Court deferred ruling on the government's motion regarding good character, but stated, "Defendant will not be permitted to introduce evidence of specific instances to show that he acted in conformity with the law on prior occasions." (Rec. Doc. 173, p. 6). Regarding the government omnibus motion, the Court granted the prosecution's motion in three important areas. First, the Court granted the motion to prohibit the defendant from making argument regarding jury nullification. (Rec. Doc. 173, p. 4). Second, the Court granted the government's motion to prohibit the defendant from raising a defense of selective prosecution—a defense that defendant had failed to raise pre-trial as required by Federal Rule of Criminal Procedure 12(b)(3). (Rec. Doc. 173, p. 4-5). Finally, the Court granted the government's motion to prohibit a public authority defense because defendant failed to comply with the notice requirement in Federal Rule of Criminal Procedure 12.3. It is undisputed that

defendant Scott did not give such notice and his counsel acknowledged awareness of the requirement.  Accordingly, the Court granted the government's motion.  (Rec. Doc. 173, p. 5).

Despite these rulings, defendant Scott has offered evidence in each of these areas. Particularly problematic is defendant Scott's direct contravention of the Court's ruling that he "will not be permitted to introduce evidence of specific instances to show that he acted in conformity with the law on prior occasions." (Rec. Doc. 173, p. 6).  As shown below, counsel has elicited this testimony from both government and defense witnesses.  In addition to violating the Court's prior ruling, this evidence violations the provisions of Federal Rule of Evidence 404(a).  The Court *sua sponte* raised this issue with counsel after the session of Court on June 11, 2021.  Although not on the record, the Court expressed a serious concern with the violation of Rule 404(a).  As this Court is aware, the allegations of misconduct by defendant Scott are extensive and both administrative findings and criminal jury verdicts have found him to have committed misconduct.  The door to <u>all</u> of this evidence has been opened by the defense.  The government should now be permitted to present testimony and evidence to counter the defense testimony.

Furthermore, to argue that it is an acceptable practice or a minor violation for a law enforcement officer to take the personal property of an arrestee and leave it in his desk for an extended period of time implicates the Court's prohibition on both jury nullification and selective prosecution evidence and arguments.  By offering this evidence, defendant Scott is asking the jury to find this practice common and acceptable and that he is being unreasonably singled out for doing it.  Furthermore, by soliciting this evidence, the defense is leaving the jury with the inference that because they have not heard of defendant Scott being disciplined for this conduct that he has not previously violated these provisions. The government will seek an appropriate instruction to the jury that they must disregard this evidence in accordance with the Court's prior instruction.  The Government must also be allowed to rebut this evidence and the implications to the jury.  As this Court is well aware and as has been litigated in this case, defendant Scott was in fact previously disciplined for keeping the personal property of arrestees in his desk.  At that time, he admitted knowing and understanding the rules prohibiting such conduct, and he was counseled regarding his violation.

To assist the Court in identifying the problematic defense evidence, the government cites to the following testimony.

**Improper evidence of defendant Scott's good character**

Defense elicited the following improper testimony regarding good conduct of defendant Scott:

In cross-examination of government witness Garrison Jordan on June 10, 2021, counsel Mr. Miller asked the following questions:

Q. Have you represented other defendants or can you quantify the number of cases in which you represented a criminal defendant in which Mr. Scott was involved in investigating the case?

A. I can't. I have no clue.
Q. An estimate of them, 10, a dozen, if you can. If not, no big deal.
A. More than 10.
Q. In those more than 10 cases, do you have any recollection of a client accusing Mr. Scott of stealing money?
A. No, sir. (p. 982, line 8-18)

In direct examination of Jeannine Davidson on June 11, 2021, counsel Ms. Amond asked the following questions:

Q. From your desk could you see everybody?
A. Yes. I could see everyone and hear everything, yes, except for the group supervisor. He has his own desk, which was back behind Justin Moran's desk, and so he had a door. (p. 1206, line 8-11)

**\*\*\*\***

Q. Did you ever see Chad utilize the personal property of an arrestee for his own use?
A. No.
Q. Did you ever see Chad remove personal property of an arrestee out of the DEA office?
A. No.
Q. You testified, Ms. Jeannine, you had an open floor plan; you could kind of see everything, hear everything.
A. Yeah.  (p. 1222, lines 13-21)

**\*\*\*\***

Q. Ms. Jeannine, you said you were familiar with Chad Scott's work area, right?
A. Yes.
Q. You could see that from your desk?
A. Yes.
Q. Have you ever seen Chad put evidence of a crime -- let's say drugs -- into his desk or desk drawers?
A. No.
Q. What about a gun? Have you ever seen Chad put a gun that was seized from a crime --
A. No.
Q. -- into his desk drawers?
A. No.
Q. What about money from an arrestee? Did you ever see Chad put money from an arrestee in his desk drawers?
A. No.
Q. Where would that stuff usually go?
A. Money was always processed by the other agents, as I stated. Even when Chad would search someone, if there was money, another agent would process it.  (p. 1231, line 11— p. 1232, line 5)

*Explanation*:

It is clear that defendant Scott has introduced evidence to the jury that not only is defendant Scott a productive agent, but that he has been productive without any instances of misconduct.  This leaves the jury with an inaccurate and incomplete portrayal of the defendant which is far from the truth.  Unless the government is able to correct this perception through a case in rebuttal, the case will go to the jury with this inaccurate portrayal.    The government should now be able to introduce a specific instance of misconduct defendant Scott to rebut the incorrect impressions that: (a) defendant Scott has never utilized the property of an arrestee for his own use; and (b) defendant Scott has not improperly stored evidence or property of arrestees in his desk or personal space.  Indeed, the Fifth Circuit has made clear that testimony relating to prior extrinsic act may be introduced if a defendant "opens the door to this testimony," even if the same evidence was initially excluded from the government's case-in-chief under a 404(b) analysis. *United States v. Maldonado*, 472 F.3d 388, 397 (5th Cir. 2006); *see also United States v. Deisch*, 20 F.3d 139, 154 (5th Cir. 1994) ("[A] defendant may not complain on appeal that he was prejudiced by evidence relating to a subject which he opened up at trial.")

Federal Rule of Evidence 404 states in part:
   (a)  Character Evidence
        (1)  Prohibited Uses.  Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.
        (2)  Exceptions for a Defendant or Victim in a Criminal Case.  The following exceptions apply in a criminal case:
             (A) a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it;

Although 404(a)(1) permits a criminal defendant to introduce "evidence of a pertinent trait of character," Rule 405(a) precludes the introduction of specific instances in which the defendant acted in conformity with that trait, and only allows evidence of a pertinent character trait in the form of reputation or opinion testimony.  This Court previously held in a police misconduct case that photos of the officer-defendant engaged in "rescue operations" during Hurricane Katrina were inadmissible character evidence on the grounds that the photographs constituted specific instances of conduct.  *United States v. Warren*, 2010 WL 4668345, at *3 (E.D. La. 2010).

Similarly, it is well-settled that "a defendant may not produce evidence of specific instances of law-abidingness as part of his defense" in order to show good character.  *United States v. Hill*, 40 F.3d 164, 168-69 (7th Cir. 1994); *see also United States v. Cleveland*, 1997 WL 253124, at * 2 (E.D. La. May 14, 1997 (unpublished) (Vance, J.) (excluding prior good acts of former defendant-legislator because "[a] defendant may not seek to establish his innocence … through proof of the absence of criminal acts on specific occasions.")  Yet despite this Court's prior consistent ruling on this point, inappropriate evidence has been admitted.

The line of questioning above about whether a witness ever saw defendant Scott engaging in misconduct, answered negatively by the witness, has been offered by defense to

convince the jury that if this witness didn't see it happen, it didn't happen in this case.  However, "[e]vidence of noncriminal conduct [introduced] to negate the inference of criminal conduct is generally irrelevant."  *United States v. Grimms*, 568 F.2d 1136, 1138 (5th Cir.1978).  The instances described above of defendant's prior compliance with the law solicited by the defense are inadmissible as "prior-honest-act" evidence.

Courts in other districts routinely apply the same reasoning found by this Court in *Warren*.  *See e.g.*, *Hill*, 40 F.3d at 168-69 (holding in a criminal trial for mail theft that evidence that the postal employee-defendant did not take "test letters" was properly deemed inadmissible on the grounds that prior-honest-act evidence is prohibited); *United States v. Camejo*, 929 F.2d 610, 613 (11th Cir. 1991) (finding that defendant's prior refusals to join a drug trafficking conspiracy were properly excluded as inadmissible prior "good acts," as evidence of good conduct is not admissible to negate criminal intent); *United States v. Scarpa*, 897 F.2d 63, 70 (2nd Cir. 1990); *United States v. O'Connor*, 580 F.2d 38 (2nd Cir. 1978) (excluding tape recorded phone calls with no drug references on the grounds that defendant may not seek to establish his innocence through proof of the absence of criminal acts on specific occasions). So, while the defendant may admit evidence of a "pertinent" character trait such as honesty, the defendant may not produce evidence of specific instances of conduct in support of that trait.  *See Cleveland* at *2.

**Improper evidence about the prevalence of DEA policy violations**

Further, defense counsel elicited the following improper testimony about the prevalence of DEA evidence policy violations and about the purportedly minor nature of such violations, which have no value except to advance a jury nullification defense.

In cross-examination of government witness Johnny Domingue on June 8, 2021, counsel Mr. Miller asked the following questions:

Q. Last question, I promise. You testified, in response to some of Mr. Miracle's questions, about the kind of stuff that was around the DEA office in Metairie, the phones, the belts, the phone chargers, that kind of thing. Do you recall that testimony?
A. Yes, sir.
Q. You also worked in Tangipahoa Parish, correct?
A. Yes, sir.
Q. Did the same kind of stuff accumulate on officers' desks in Tangipahoa Parish? Phones, belts, desks?
A. Yes, sir. (p. 477, lines 1-11)

In cross-examination of government witness SA Christopher Goumenis on June 10, 2021, counsel Ms. Veith asked the following questions:

Q. So you talked about how it's against DEA policies to keep evidence at your desk or in a file cabinet or personal property at your desk or in a file cabinet; right?
A. Yes, ma'am.

Q. Because it's against DEA policies, is it common that there might be emails that go out reminding DEA agents, "Keep your desk clean. Don't keep personal property at your desk"?

A. Yes.

Q. Is that because sometimes it happens that DEA agents will keep personal property at their desk and they need to clean it up?

A. I would assume so, yes.

Q. In your career and in all of your overseeing of the various task force groups, have you ever known of anyone that you oversee to keep personal property at a desk that then needed to be removed?

A. Yeah. But as soon as I was advised of it, I had them remove it and placed it in the correct place.

Q. That's right. But before you advised them to remove it, they had -- for some reason, personal property had accumulated at their desk; is that right?

A. It has happened, yes, ma'am.

Q. So when you asked them to immediately remove it from their desk, that's because it's a violation of DEA policies. That's an administrative violation; right?

A. Correct.

Q. It's not a violation of a law; right?

A. Correct.

Q. And that property that was located at their desk, although it's not in the right place, it's still in DEA custody; right?

A. Yeah, they deprived the defendant of it, correct.

Q. Well, so that's not my question. My question is --

A. Well, I stated earlier that once it's seized, it's depriving the defendant.

Q. Oh, you're saying the DEA deprived the defendant of it; right?

A. Correct, yeah.

Q. Okay, just to be very clear. So my question specifically, though, the DEA is the one that has custody of the property at that point; right?

A. Yes, technically speaking.

Q. And those agents that, you know, you learned that they had personal property at their desk, and so you immediately asked them to remove it. Were they dismissed from their position for that?

A. Were they fired?

Q. Yes.

A. No. But they were verbally counseled. If it happened more than once, they could be written up which can affect promotion, which can affect bonuses, which can affect a lot of career growth.

Q. Understood. Thank you. (p. 923, line 21 – p. 925, line 22)

In direct examination of Jeannine Davidson on June 11, 2021, counsel Ms. Amond asked the following questions:

Q. Ms. Jeannine, do you know, if someone didn't abide by the clean desk policy, what the repercussion would be?

A. I'm sure their supervisor would reprimand them, talk to them, tell them they need to put stuff away.

Q. Anybody ever get arrested for that?

A. No. It's a policy. (Page 1231, lines 2-7)

****

Q. Is the DEA office in New Orleans a busy office?

A. Some groups are busier than others.

Q. How about Group 10? Were they a busy group?

A. At that time they were very busy.

Q. What do you mean by that?

A. Well, they led in arrests, seizures.

     MR. MIRACLE: Objection, Your Honor.

     THE COURT: Sustained.

BY MS. AMOND:

Q. Especially from where you were sitting, did personal property of arrestees often accumulate on the desks of the task force agents?

A. Yes.

Q. What kind of stuff are we talking about?

A. Well, as I mentioned earlier, duffel bags, stuff they would find in searches, driver's licenses. I think I saw jumping cables one time. Cell phones. Stuff they would take off the defendant or a suspect at the time or whatever they would find during the search of a car or a house.

Q. In your experience, have arrestees' families often come picked that stuff up?

A. Hardly ever.

Q. The DEA office, is it a secure facility?

A. Yes. (p. 1232, line 6—p. 1233, line 4)

****

Q. Was Group 10 always in the same space?

A. No. We moved. So we were in a different space over in the corner, and then the pictures you showed, we moved into that space, and another group was there.

Q. Before?

A. Before Group 10, yes. When we moved into that space, there was a lot of stuff left from the group that was there prior. (p. 1233, line 20 – p. 1234, line 2)

*Explanation*:

     The above testimony about the purportedly minor nature of DEA policy infractions raises an inference that defendant Scott has not previously been reprimanded for violating DEA evidence policy. Such an inference is untrue. The government should be allowed to rebut this inference by presenting testimony of a specific instance in which defendant Scott was reprimanded for an evidence policy violation. Furthermore, defense counsel's emphasis on the frequency and purportedly minor nature of DEA evidence policy violations does not make any

fact at issue more or less probable than it would be without the evidence, as required by Federal Rule of Evidence 401. This evidence has no value to the charges and serves only to suggest to the jury that defendant Scott simply engaged in insignificant policy violations that do not warrant criminal charges. This impression is inaccurate and could only be used as part of an argument for jury nullification, which this court has prohibited.

*Remedies:*

The government should additionally be allowed to rebut the improper evidence offered by the defense by responding in kind to cure the damage done. These are not minor points in this case, rather they are inadmissible and prejudicial evidence that may affect the verdict. The government's rebuttal evidence would be directly on point to rebut what has been offered by the defense. For example, the government intends to offer evidence that defendant Scott has on prior occasions committed offenses other than those for which he stands charged. The government also intends to offer evidence that defendant Scott previously engaged in keeping the property of arrestees and was in fact disciplined for those violations.

Additionally, the government intends to seek a curative instruction on each of the following points: (1) evidence that defendant Scott acted in conformity with the law on prior occasions shall not be considered as to whether he committed the offenses of which he stands charged; (2) the jury may not nullify their finding of guilt beyond a reasonable doubt because of defendant Scott's prior conformity with the law or productivity as a law enforcement officer; and (3) evidence that other law enforcement officers may have engaged in keeping the property of arrestees or that it was a minor administrative violation to do so may not be considered as to the defendants' guilty or innocence.

/s/ Charles A. Miracle
Timothy A. Duree
Charles A. Miracle
Trial Attorneys
Criminal Division
U.S. Department of Justice