1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4    UNITED STATES OF AMERICA        *        17-CR-181
                                     *
5    versus                          *        Section H
                                     *
6    CHAD ALLEN SCOTT                *        August 11, 2021
                                     *
7    * * * * * * * * * * * * * * * *

8
                              DAY 1
9                    SENTENCING HEARING BEFORE
                THE HONORABLE JANE TRICHE MILAZZO
10                  UNITED STATES DISTRICT JUDGE

11
     Appearances:
12

13   For the United States       U.S. Department of Justice
     of America:                 BY:  CHARLES A. MIRACLE, ESQ.
14                                145 N Street NE
                                  Washington, DC 20530
15

16   For the United States       U.S. Department of Justice
     of America:                 BY:  TIMOTHY A. DUREE, ESQ.
17                                1400 New York Avenue NW, 3rd Floor
                                  Washington, DC 20005
18

19   For Chad Allen Scott:       Fishman Haygood, LLP
                                  BY:  KERRY J. MILLER, ESQ.
20                                201 St. Charles Avenue, Suite 4600
                                  New Orleans, Louisiana 70170
21

22   For Chad Allen Scott:       Mills & Amond, LLP
                                  BY:  KRISTEN D. AMOND, ESQ.
23                                650 Poydras Street, Suite 1525
                                  New Orleans, Louisiana 70130
24

25

1    Appearances:

2

3    For Chad Allen Scott:        Garcia & Artigliere
                                  BY:   MATTHEW M. COMAN, ESQ.
                                  400 Poydras Street, Suite 2045
4                                 New Orleans, Louisiana 70130

5

6    For Chad Allen Scott:        Garcia & Artigliere
                                  BY:   STEPHEN M. GARCIA, ESQ.
                                  One World Trade Center, Suite 1950
7                                 Long Beach, California 90831

8

9    Official Court Reporter:     Toni Doyle Tusa, CCR, FCRR
                                  500 Poydras Street, Room B-275
                                  New Orleans, Louisiana 70130
10                                (504) 589-7778

11

12

13

14   Proceedings recorded by mechanical stenography using
     computer-aided transcription software.
15

16

17

18

19

20

21

22

23

24

25

1          <u>INDEX OF WITNESSES</u>

2                                              <u>Page</u>

3    Rachel Pierce
          Direct Examination By Mr. Coman         7
4         Cross-Examination By Mr. Duree          33

5    Julius Cerdes
          Direct Examination By Mr. Miracle      69
6         Cross-Examination By Mr. Garcia        80
          Redirect Examination By Mr. Miracle    88

7
     Charles Tilley
8         Direct Examination By Mr. Miracle      89

9    Christopher Simon
          Direct Examination By Mr. Duree        93
10        Cross-Examination By Mr. Garcia       105
          Redirect Examination By Mr. Duree     109

11
     Richard Hardgrave
12        Direct Examination By Mr. Duree       110
          Cross-Examination By Mr. Garcia       113
13        Redirect Examination By Mr. Duree     117

14   Nicholas Dittlinger
          Direct Examination By Mr. Coman       119
15        Cross-Examination By Mr. Miracle      121

16   Tyler Scott
          Direct Examination By Mr. Garcia      123
17        Cross-Examination By Mr. Miracle      127

18

19

20

21

22

23

24

25

1                      <u>**MORNING SESSION**</u>

2                      **(August 11, 2021)**

3          **THE DEPUTY CLERK:**  Court is now in session.  You may

4   all be seated.

5          **THE COURT:**  Good morning.

6          **THE DEPUTY CLERK:**  Criminal Action 17-181,

7   *United States of America v. Chad Allen Scott*, set for

8   sentencing.  Counsel, please make your appearances for the

9   record.

10         **MR. DUREE:**  Good morning, Your Honor.  Tim Duree and

11  Charles Miracle for the government.

12         **MR. MILLER:**  Good morning, Judge.  Kerry Miller for

13  Chad Scott.

14         **MR. COMAN:**  Good morning, Your Honor.  Matt Coman and

15  Steve Garcia on behalf of Chad Scott.

16         **MS. AMOND:**  Good morning, Your Honor.  Kristen Amond

17  for Chad Scott.

18         **THE COURT:**  Thank you.  This matter is before the

19  Court for sentencing.  Is there any reason why sentence should

20  not be imposed at this time?

21             Mr. Duree?

22         **MR. DUREE:**  No, Your Honor.

23         **THE COURT:**  Mr. Coman?

24         **MR. COMAN:**  We are ready, Judge.

25         **THE COURT:**  The presentence report has been prepared

1   pursuant to Rule 32 of the Federal Rules of Criminal Procedure.
2   I've read it, considered it, and allowed comment thereon by the
3   defendant, his counsel, and the government.
4           The Court had multiple meetings with counsel
5   before trial and after trial.  Before trial, we had set this
6   date; after trial, the parties fervently wished to preserve
7   this date of sentencing.  As a result, it has affected the
8   timelines that are allowed under Rule 32 of the Federal Rules
9   of Criminal Procedure.
10         I received objections to some of the findings in
11   the presentence report.  Before we got to the substantive
12   objections, there was an objection raised as to the time limits
13   that were not allowed because the parties had requested that we
14   maintain this sentencing date.  I'm going to now ask you on the
15   record whether or not you waive those deadlines associated with
16   Rule 32 of the Federal Rules of Criminal Procedure.
17        Mr. Duree?
18      **MR. DUREE:**  We waive, Your Honor.
19      **THE COURT:**  Mr. Coman?
20      **MR. COMAN:**  We concur, Judge.
21      **THE COURT:**  Mr. Scott?
22      **THE DEFENDANT:**  Yes, ma'am.
23      **THE COURT:**  Thank you.  Mr. Scott, have you received
24   a copy of the presentence report?
25      **THE DEFENDANT:**  Yes, ma'am, I have.

1    **THE COURT:**  Have you had an opportunity to read it?

2    **THE DEFENDANT:**  Yes, I have.

3    **THE COURT:**  Okay.  The defendant has filed three

4    objections to the report.  Objection 1, the defendant objects

5    to paragraphs 96 and 103.  The defendant objects to the base

6    level as it applies to Groups 2 and 3.  Defendant avers that

7    the officer erred in applying a cross-reference at Sentencing

8    Guideline § 2J1.3(c)(1) to accessory after the fact, § 2X3.1,

9    which requires the Court to use the underlying base in

10   determining the base level if it exceeds the base level at

11   § 2J1.3(c)(1).  The officer preparing this report referred to

12   the conviction of Jorge Perralta's base level.

13           Objection 2, the defendant objects to paragraphs

14   82 through 89 and 119 through 121 in which the officer grouped

15   the counts of conviction in four distinct groups.

16           Objection 3, the defendant objects to paragraph

17   111.  Here the defendant objects to both the value of the

18   property converted and the number of victims.

19           Do the parties have any objections they wish to

20   raise at this time in addition to what's already been

21   previously raised?

22   **MR. DUREE:**  Nothing from the government, Your Honor.

23   **MR. COMAN:**  No, ma'am.

24   **THE COURT:**  Okay.  Thank you.  I would like to have

25   argument on Objection 1, which relates to the cross-reference.

1                    Mr. Coman, are you ready to proceed?

2              **MR. COMAN:**  Yes, ma'am, I am, Judge.  In furtherance

3    of the Rule 32, we just have one short witness, Rachel Pierce,

4    who is outside in the hallway.

5                    Would you call in Ms. Pierce, Rachel Pierce.

6              **THE COURT:**  This is to Objection 1?

7              **MR. COMAN:**  It's actually to all three, Judge.

8              **THE COURT:**  Okay.

9              **MR. COMAN:**  Judge, I wasn't sure of the Court's

10   admonition at the podium.  Can we take off masks if vaccinated?

11             **THE COURT:**  If vaccinated.

12             **MR. COMAN:**  I have two shots.

13                         **RACHEL PIERCE,**

14   having been duly sworn, testified as follows:

15             **THE DEPUTY CLERK:**  Please be seated.  State and spell

16   your name for the record.

17             **THE WITNESS:**  My name is Rachel Pierce, R-A-C-H-E-L,

18   P-I-E-R-C-E.

19                      **DIRECT EXAMINATION**

20   **BY MR. COMAN:**

21   **Q.**   Ms. Pierce, did you recently retire from the United States

22   Sentencing Commission?

23   **A.**   Yes, sir, I did.

24   **Q.**   When was that?

25   **A.**   My last day on duty was May 31, 2021.

RACHEL PIERCE - DIRECT

1  **Q.**   Okay.  How long did you serve with the U.S. Sentencing
2  Commission?
3  **A.**   Okay.  I would have celebrated 23 years this coming
4  October, so just over 22.
5  **Q.**   At the Sentencing Commission, what roles did you serve in?
6  **A.**   So I was in the office of education and sentencing
7  practice, and my primary role throughout my career there was
8  that of training on sentencing guidelines.  I retired as a
9  senior education and sentencing practice specialist at the
10  United States Sentencing Commission.
11  **Q.**   As part of your role and duties at the Sentencing
12  Commission, did you field inquiries from federal districts from
13  various personnel regarding the interpretation of the
14  guidelines?
15  **A.**   Absolutely.  All the time.
16  **Q.**   In that role did you provide consultation in approximately
17  5,000 U.S. Sentencing Commission help line calls?
18  **A.**   Yes.  I think that's a pretty -- maybe a low estimate, but
19  that's a fair estimate, about 5,000.
20  **Q.**   What's a help line call?
21  **A.**   So the Commission runs what they call a help line, which
22  is a service to the field -- and by that I mean probation
23  officers, judges, attorneys that are practicing in federal
24  court -- to call the help line and ask questions about
25  guideline application.  So that's what the help line function

RACHEL PIERCE - DIRECT

1    serves.

2    **Q.**    Okay.  In your role did you also provide training to

3    probation officers throughout the country?

4    **A.**    I did.

5    **Q.**    Approximately how many?

6    **A.**    Thousands, tens of thousands possibly over 20 years.

7    **Q.**    We are talking about federal probation officers, correct?

8    **A.**    That's correct.

9    **Q.**    Was it in the realm of supervision or was it in the realm

10   of calculating and interpreting the guidelines for sentencing

11   purposes?

12   **A.**    Mostly in the realm of calculating the guidelines, which

13   would be presentence writers.

14           **MR. DUREE:**  Your Honor, before we get into what I

15   suspect is going to be the substance here, I'm going to object

16   to the relevance of any of what I expect to be the forthcoming

17   testimony.  I'm happy to explain that objection here or

18   approach at the bench if you prefer.

19           **THE COURT:**  You can explain your objection there.

20           **MR. DUREE:**  Is it okay if I remove my mask?

21           **THE COURT:**  Yes.

22           **MR. DUREE:**  Your Honor, my objection is based on

23   this.  It appears to me that what the witness is about to do is

24   give what would amount to an expert opinion about the

25   application of the sentencing guidelines in this case, and

RACHEL PIERCE - DIRECT

1  there are several reasons why I think that that is completely
2  inappropriate.
3           The first, sort of as an obvious threshold
4  matter, is if defense is going to hold this witness out as an
5  expert on these matters, she was not so noticed, there's been
6  no discussion of that, and so that's a hurdle to get past
7  initially.
8           The second is that, as a matter of relevance,
9  it's wholly unhelpful here for an individual outside of this
10  case to opine on the application of guidelines because, simply
11  put, they aren't immersed in the facts of this case and don't
12  know them, which then brings me to the third point.
13           A witness to testify about the application of
14  the guidelines, in my eyes, is inappropriate and undermines the
15  authority of this Court because we already have an expert on
16  the guidelines in this courtroom.  It is you.  We have a
17  probation officer who has applied the guidelines based on
18  applicable law and the Guidelines Manual and applied those to
19  the facts.  So if there is a dispute about whether a certain
20  guideline provision applies, we look to the law.  We apply that
21  law to the facts.  We place that decision in your hands, the
22  expert, the judge.
23           So it is my respectful objection that to have an
24  outside party unaffiliated with this case come in as a
25  purported pseudo expert on the guidelines to explain to this

RACHEL PIERCE - DIRECT

1  Court how the guidelines should be applied is inappropriate and
2  also disrespectful to this Court.
3       THE COURT:  Okay.
4       MR. COMAN:  Judge, under Rule 1101(d)(2), the Rules
5  of Evidence do not apply at sentencing.  The part about 702 and
6  expert, obviously you push that to the side.
7            Ms. Pierce is a retired probation officer.  She
8  is not a lawyer.  She is not going to be offering a legal
9  opinion.
10           Obviously, under Rule 32 both parties have a
11  right, in support of their objections, to offer evidence to the
12  Court.  Obviously, in the end it's your determination.  We are
13  not saying she gets to put the robe on.  You have got the robe
14  and we understand that, but certainly under Rule 32 we are
15  allowed to offer this evidence for the Court's consideration.
16           THE COURT:  I'm going to allow her to testify.  I am
17  well aware of my responsibilities associated with this case.
18  I'm well aware of how the hotline works at the Sentencing
19  Commission and Mr. Dorhoffer and other people associated with
20  the Sentencing Commission that I speak to on a pretty regular
21  basis.
22           You may proceed.
23       MR. COMAN:  Thank you, Judge.
24  BY MR. COMAN:
25  Q.   I think I left off with your training, and I want to go

RACHEL PIERCE - DIRECT

1    through just a little bit more of your background as well to
2    provide context to this matter.
3            In addition to you training probation officers, did
4    you also conduct that training at FLETC itself?
5    A.    I did.
6    Q.    What's FLETC?
7    A.    FLETC is the Federal Law Enforcement Training Center.
8    It's essentially an academy-based program that new hires for
9    U.S. Probation go through.  It's a six-week program.  So I was
10   responsible for a federal sentencing guidelines training module
11   within that six-week period.
12   Q.    Okay.  In addition to your training in those two respects
13   or those multiple respects, do you also serve or did you serve
14   on various subcommittees within the Sentencing Commission?
15   A.    I did.  I served on a number of what we call policy teams
16   at the Sentencing Commission, which helped the commissioners
17   develop policy.  The commissioners are the ones that ultimately
18   develop the policy as it relates to guideline application, but
19   the working groups are at the staff level.  They are
20   multidisciplinary based on, you know, the different units
21   within the Commission, and we all work together to provide that
22   assistance to the commissioners.
23   Q.    The Commission itself, is that made up of -- I want to say
24   part-time, but volunteer part-time --
25   A.    They are part-time presidential appointees, yes.

RACHEL PIERCE - DIRECT

1  **Q.**   Okay.  Does that include federal judges?

2  **A.**   It does.

3  **Q.**   Okay.  Your role with the other staff members, that's in a

4  full-time capacity; is that correct?

5  **A.**   It was, correct.

6  **Q.**   During your tenure with the U.S. Sentencing Commission,

7  did you also train members of the federal judicial community?

8  **A.**   I did.

9  **Q.**   Like what?  Like whom?

10  **A.**   Like judges, defense attorneys, public defenders, CJA

11  attorneys, also probation officers as I have mentioned,

12  courtroom staff, prosecuting attorneys.  Anybody within the

13  court family, really, we were responsible for providing

14  training for.

15  **Q.**   Okay.  Approximately how many federal districts did that

16  entail?

17  **A.**   Almost all of them.  There's just a handful that I have

18  not been to.

19  **Q.**   Transitioning to the instant matter here, *United States v.*

20  *Chad Allen Scott*, have you had an opportunity to review the

21  superseding indictment in this matter?

22  **A.**   Yes, I have.

23  **Q.**   Have you also reviewed the presentence report?

24  **A.**   I have.

25  **Q.**   Let me first start with the application of the

RACHEL PIERCE - DIRECT

1    cross-reference we will call it for today's purposes.  In
2    paragraphs 96 and 103, did you recognize and see that the draft
3    PSR, presentence report, opined that the cross reference in
4    § 2J1.3(c)(1), accessory after the fact, should be applied in
5    this case?
6    A.    I did see that.
7    Q.    Are you familiar with that particular section and sections
8    that are related to that § 2J1.3(c)?
9    A.    Yes, I am.
10   Q.    Have you been asked over the past decades to interpret
11   those sections and their applications to various fact patterns?
12   A.    Yes.  Along with many others.
13   Q.    I'm sorry?
14   A.    Along with many other applications.
15   Q.    Sure.  Sure.  Have you answered those questions and
16   provided opinions in that capacity?
17   A.    Yes.
18   Q.    Having reviewed the superseding indictment, the PSR, and
19   the U.S. Sentencing Guidelines, does the cross-reference apply
20   here?
21   A.    I do not think it applies in this case.
22   Q.    Why not?
23   A.    Well, I'll start with just the language of the
24   cross-reference.  It reads if the offense "involved perjury,
25   subornation of perjury, or witness bribery in respect to a

RACHEL PIERCE - DIRECT

1   criminal offense," and what I will start with is the offense
2   and what I believe the guidelines say about what the offense
3   means.
4           If you look back at § 1B1.1, which is the guideline
5   for application instructions -- that's where you get, you know,
6   how to apply the guidelines A to Z, right.  If you look at
7   Application Note 1(I) it states, "'Offense' means the offense
8   of conviction and all relevant conduct under § 1B1.3," which is
9   the relevant conduct guideline, "unless a different meaning is
10  specified or is otherwise clear from the context."
11          So I would say the offense of conviction here, at
12  least with respect to § 2J1.3, is perjury, right, the perjured
13  statements that were made by the defendants.
14          Relevant conduct is a very specific analysis in the
15  guidelines and it focuses on acts; that is, either acts
16  committed by the defendant, in this case Mr. Scott, or by
17  someone else that the defendant is involved in a jointly
18  undertaken criminal activity that occurred during the offense,
19  in preparation, or to avoid detection or responsibility for the
20  offense of conviction.
21          The relevant conduct guideline speaks to the fact
22  that Chapter 2 and Chapter 3 of the guidelines are to be
23  applied on this relevant conduct analysis.  So because it's
24  very specific, what we have to determine in order to apply this
25  cross-reference -- and, you know, it's being applied in respect

RACHEL PIERCE - DIRECT

1    to a drug offense, if I'm correct about that.  We have to

2    determine that either defendant was involved in that underlying

3    offense or was involved in a jointly undertaken criminal

4    activity with another individual in a drug offense in order for

5    the offense to involve perjury in respect to a criminal

6    offense.

7    Q.   Okay.  Starting back, if I could, with what you said,

8    § 1B1.1 -- and that's the (I).  That's the definition of

9    "offense," which includes what it says, offense of conviction,

10   number one; is that correct?

11   A.   Correct.

12   Q.   And then, two, and/or relevant conduct under § 1B1.3?

13   A.   Correct.

14   Q.   Which would include what you described, the acts and

15   jointly undertaken criminal activity?

16   A.   Correct.

17   Q.   Okay.  Does it include some result or consequence?

18   A.   Not unless you can establish an act either committed by

19   the defendant or by someone else in which the defendant is

20   involved in the jointly undertaken criminal activity.

21   Q.   Okay.  So if we back up, here the offense of conviction

22   would be the perjury and/or the subornation of perjury,

23   correct?

24   A.   Correct.

25   Q.   The jointly undertaken activity would have to involve the

RACHEL PIERCE - DIRECT

1    perjury and not the drugs; is that correct?

2    A.    Well, in order for the cross-reference to apply, the

3    jointly undertaken criminal activity would need to involve the

4    drug offense.

5    Q.    So is it correct, then, in the application that "offense,"

6    that definition, it's limited to what it says in the book under

7    § 1B1.1 in addition to § 1B1.3, relevant conduct?

8    A.    I would agree, yes.

9    Q.    So from there, defining the scope of the offense, would

10   that limit it to perjury and subornation of perjury?

11   A.    Based on the facts of this case, I believe so.

12   Q.    Okay.  The drug activity itself or distribution of drugs,

13   the underlying conviction of Jorge Perralta or the underlying

14   conduct, under § 1B1.3, as to the facts that are alleged in the

15   PSR as well as what's contained in the superseding indictment,

16   did you see any link between Chad Scott and his offense of

17   conviction or any alleged conduct that had any connection with

18   Jorge Perralta dealing drugs?

19   A.    I did not see a preponderance of the evidence based on

20   these facts.

21   Q.    The cross-reference itself in § 2J1.3(c) in the commentary

22   also references or, excuse me, does it reference and relate

23   back to § 2J1.2?

24   A.    Correct.

25   Q.    Okay.  How so?

RACHEL PIERCE - DIRECT

1   A.   So there's commentary at § 2J1.2 -- hopefully you can hear
2   me as I'm reading and going away from the mic -- that says
3   that -- it's the second paragraph of the background that says,
4   "The specific offense characteristics reflect the more serious
5   forms of obstruction.  Because the conduct covered by this
6   guideline is frequently part of an effort to avoid punishment
7   for an offense that the defendant has committed or to assist
8   another person to escape punishment for an offense, a
9   cross-reference to § 2X3.1" applies, which I think is
10  consistent with -- that commentary is consistent with my
11  description and explanation of the relevant conduct analysis,
12  establishing either an act committed by the defendant or an act
13  committed by someone else if the defendant is involved in a
14  jointly undertaken criminal activity.
15            THE COURT:  Does it matter that they say "frequently"
16  instead of "always"?
17            THE WITNESS:  I think "frequently" means frequently.
18  It's not always the case.  The facts of this case are unusual
19  in my experience.  The guidelines often say "frequently" so as
20  not to make a blanket statement that everything applies in a
21  certain way.
22  BY MR. COMAN:
23  Q.   The background commentary that's listed in § 2J1.2, does
24  that also apply to § 2J1.3?
25  A.   I think there's a very strong argument that it does.

RACHEL PIERCE - DIRECT

1   While the very specific words are not exactly the same, there

2   is a line in the background commentary at § 2J1.3 that says,

3   "The Commission believes that perjury should be treated

4   similarly to obstruction of justice.  Therefore, the same

5   considerations for enhancing a sentence are applied in the

6   specific offense characteristics and an alternative reference

7   to the guideline for accessory."

8           I would also point out, in looking at the historical

9   note for both of these guidelines, § 2J1.2 and § 2J1.3 -- and

10  to be clear, a historical note lists every single time that the

11  guidelines have been amended in that case.  In 2003, 2011, and

12  2013, both § 2J1.2 and § 2J1.3 were amended at the same time in

13  order to promote consistency between the guidelines, which I

14  think also lends credence to the argument that these two

15  guidelines are to be treated similarly.

16  Q.   Okay.  As to all background and commentary in the

17  sentencing guidelines, is it correct that it's actually,

18  quote/unquote, authoritative both under the guidelines as well

19  as under Supreme Court precedent?

20  A.   That's correct.

21  Q.   So it's not just there for helpful guidance; it actually

22  carries weight of law.  Is that your assessment?

23  A.   Yes.  And I would reference I believe it's § 1B1.7.

24  Q.   Which says what?

25  A.   "Significance of Commentary."

RACHEL PIERCE - DIRECT

1          No.  Is that right, Matt, § 1B1.7?

2          **THE COURT:**  Yes.

3          **MR. COMAN:**  I believe it should be § 1B1.7, and the

4    case is listed as *Stinson v. United States*, that's correct.

5          **THE WITNESS:**  I'm not actually sure if that's the --

6    I'm sorry, it's § 1A3.1.

7    **BY MR. COMAN:**

8    **Q.**   Okay.  Fair enough.

9    **A.**   I apologize, § 1A3.1:

10         "The guidelines, policy statements, and commentary

11   set forth in the Guidelines Manual, including amendments

12   thereto, are promulgated by the United States Sentencing

13   Commission pursuant to: (1) Section 994(a) of Title 28,

14   United States Code; and (2) with respect to guidelines, policy

15   statements, and commentary promulgated or amended pursuant to

16   specific Congressional directive, pursuant to the authority

17   contained in that directive in addition to the authority under

18   Section 994(a) of Title 28, United States Code."

19   **Q.**   Okay.  Turn, if you could, to § 1B1.3, "Relevant Conduct."

20   I want to ask you a couple of questions about the scope of what

21   "jointly undertaken criminal activity" means to the Sentencing

22   Commission and the guidelines.  How is that defined?

23   **A.**   So if you look further at Application Note 3 to the

24   relevant conduct guideline at § 1B1.3, it defines:  "In

25   general, a 'jointly undertaken criminal activity' is a criminal

RACHEL PIERCE - DIRECT

1    plan, scheme, endeavor, or enterprise undertaken by the
2    defendant in concert with others, whether or not charged as a
3    conspiracy," and there is what the Commission calls a
4    three-part test or a three-part requirement to be met in order
5    to establish a jointly undertaken criminal activity.
6            The first piece of that is the scope of the jointly
7    undertaken criminal activity, that is, what are the actions,
8    what is the conduct that the individuals agreed to commit
9    together.  In this instance, it would be the drug offense, did
10   Mr. Scott agree with Mr. Perralta or anyone else in this case
11   to commit a drug offense.  That would establish a jointly
12   undertaken criminal activity between the parties.
13           If that cannot be established, you can't move to the
14   next steps, and that is are those acts in furtherance of what
15   the defendants agreed to do together and are they reasonably
16   foreseeable.  So if you can't establish a scope that
17   establishes a jointly undertaken criminal activity, you stop
18   there.
19   Q.   So if the jointly undertaken activity does not include any
20   involvement of the distribution of drugs as to Mr. Scott, is it
21   correct, then, under the strict reading of the guidelines, any
22   Chapter 2 enhancement -- and specifically § 2J1.2 and .3 --
23   cannot be applied?
24   A.   That's correct.
25   Q.   To your knowledge, has the cross-reference ever been

RACHEL PIERCE - DIRECT

1   applied in a case in the United States where the defendant was
2   accused and convicted of ensuring a conviction of someone else?
3   A.   Not to my knowledge.  I will say guideline application is
4   very fact specific.  I mentioned that I've answered a lot of
5   questions regarding cross-references not only at this
6   guideline, but other guidelines as well, and so I can't speak
7   to -- if the facts would change, you know, the analysis might
8   change.  In this case, I don't believe it applies, and I have
9   never heard of such a case with these exact facts where it
10  does.
11          THE COURT:  Have you heard of a case with these facts
12  at all, where they didn't apply or --
13          THE WITNESS:  Honestly, not to my recollection.  This
14  is a unique case in my experience.
15          THE COURT:  Yes.
16  BY MR. COMAN:
17  Q.   In addition to the cross-reference application, did you
18  see that the probation department, the probation officer at
19  least, had assigned a two-level increase for abuse of trust and
20  a two-level increase for a leadership role?
21  A.   I did see that.
22  Q.   Okay.  If the cross-reference was applied, that would be
23  saying that an individual, in this case Mr. Scott, had some
24  part in some action with distribution of drugs; is that
25  correct?

RACHEL PIERCE - DIRECT

1    **A.**   I believe so.  I think, again, in order to apply the
2    cross-reference, you would have to establish either actions by
3    Mr. Scott or jointly undertaken criminal activity, and then
4    from there § 1B1.5 directs that when you cross-reference to
5    another guideline, you're applying Chapter 3 adjustments based
6    upon that cross-reference.  So then you would be looking at any
7    potential aggravating role or abuse of trust within the context
8    of that drug conduct or drug offense.
9    **Q.**   Okay.  So for those two to apply, there would have to be
10   some facts to support that Agent Scott led or had some
11   managerial role in distributing drugs, correct?
12   **A.**   Correct.
13   **Q.**   And/or abused his position of trust in distributing drugs;
14   is that right?
15   **A.**   Correct.
16   **Q.**   To your knowledge, has the United States Sentencing
17   Commission maintained the same position that you just provided
18   to the Court?
19   **A.**   To my knowledge, yes, sir.
20   **Q.**   As we see in the PSR, it was a 16-level enhancement; is
21   that correct?
22   **A.**   That's correct.
23   **Q.**   Where it came from a basis offense level of 14; is that
24   correct?
25   **A.**   Correct.

RACHEL PIERCE - DIRECT

1  **Q.**   Let me move on, if I could, to the grouping and
2  multiple-count adjustment portion of the presentence report.
3           Did you see that the probation officer had gone
4  through a rather complicated scenario for my small brain to
5  come up with grouping as well as a multicount adjustment,
6  assigning units that then resulted in some additional increase?
7  Did you see that?
8  **A.**   I did see that.
9  **Q.**   Okay.  In your estimation, is that correct?
10 **A.**   I don't believe so entirely.
11 **Q.**   Okay.  Why not?
12 **A.**   So I like to think of grouping as a process of
13 elimination, and when I would teach grouping I would teach it
14 as such.  We would always advise that you start by looking at
15 grouping under Rule D.  Number one, it's the easiest rule to
16 apply; and, number two, over 70 percent of cases in federal
17 court will end up grouping under Rule D.  So we always just
18 sort of advised, "Let's look at Rule D and see if you have any
19 counts that group under Rule D first."
20 **Q.**   Let me back up, if we could.  What section are we talking
21 about?
22 **A.**   I'm talking about § 3D1.2.
23 **Q.**   Okay.  § 3D1.2.
24 **A.**   Rules A, B, C, and D.
25 **Q.**   I'm sorry, go ahead.

RACHEL PIERCE - DIRECT

1   **A.**   So when you look at the counts that Mr. Scott is convicted
2   of, Counts 8 and 9, which deal with the conversion of the
3   property, I believe group under Rule D.  So I would agree with
4   probation in that application grouping those counts into a
5   single-count group.
6           They group under Rule D because § 2B1.1 is applied
7   for both of those counts of conviction.  Rule D states that any
8   time the offense level is determined largely on the basis of
9   the total amount of harm or loss, offenses covered by the
10  following guidelines, which include § 2B1.1, are to be grouped
11  under this rule.  So I would start there, and I would say that
12  I would agree with probation's characteristics about that
13  point.
14          Then I would advise that you look at the rest of the
15  Counts 1 through 7.  Again, this is consistent with how I would
16  always train grouping.  For counts that don't group under
17  Rule D, you have to apply the guidelines for each count of
18  conviction, and so my advice always was apply the guidelines
19  for the rest of the seven counts.
20          So for counts -- everything other than 4 and 6,
21  you're going to be applying § 2J1.2, right.  Then for Counts 4
22  and 6, you are going to be applying § 2J1.3.  So then I would
23  say you look at all of those counts and see if any of them can
24  then group together.  I think there's a strong argument to be
25  made in this case that these counts could all group together

RACHEL PIERCE - DIRECT

1    under Rule B, which would be when counts involve the same

2    victim or two or more acts or transactions connected by a

3    common criminal objective or constituting a common scheme or

4    plan.

5           The reason why I say there's a strong argument for

6    that is if you look at the definition of "victim" for purposes

7    of grouping under § 3D1.2, Application Note 2 says, "The term

8    'victim' is not intended to include indirect or secondary

9    victims.  Generally, there will be one person who is directly

10   and most seriously affected by the offense and is therefore

11   identifiable as a victim."

12          The application note goes on to say that in the

13   absence of that, essentially, what you look at is the societal

14   interest that is harmed.  I believe the probation department

15   did a good job of making the argument that the societal

16   interest that is harmed here is, you know, the deprivation of

17   honest services to the local communities and the State of

18   Louisiana in this case.

19   Q.   In fact, in I believe it's paragraph 76 in the victim

20   impact portion of the PSR, did the probation officer actually

21   say, "The public is the primary victim"?

22   A.   Correct.

23   Q.   So based on that as well as the other information in the

24   case, looking back on § 3D1.2 and under subsection (b) that

25   would be all these counts under the guidelines at least -- not

RACHEL PIERCE - DIRECT

1  statutory, but under the guidelines would then group together
2  as one; is that correct?
3  **A.**   Counts 1 through 7, correct.
4  **Q.**   Let's talk about Counts 8 through 9.
5  **A.**   Correct.
6  **Q.**   The conversion counts -- and I believe it's under
7  subsection (d) -- how is that addressed by the guidelines?
8  **A.**   So, again, if you think about it as a process of
9  elimination, those are the two counts that we grouped first to
10 form one count group.  Then if you follow my discussion about
11 grouping for Counts 1 through 7, those would group under Rule B
12 and now you would have two count groups.  So you keep grouping,
13 you keep applying the grouping rules at § 3D1.2 until you can't
14 group anymore; and if that's the case, you move on at assigned
15 units.

16        So back to the two count groups that we have, again I
17 think there's probably a strong argument to be made that then
18 those two count groups could also group under Rule B involving
19 the same victim, which is the harm to the public, and a common
20 criminal objective.
21 **Q.**   In fact --
22        **THE COURT:**  I'm looking at this "and two or more
23 acts."  Do you think these are all the same acts, 1 through 7?
24        **THE WITNESS:**  Oh, no, I don't think it's all the same
25 act.  I think it's two or more.  I think there's numerous acts

RACHEL PIERCE - DIRECT

1  here, but I think there's an argument to be made that because
2  the victim, the societal interest that is harmed, is arguably
3  the same in all of these counts, then you could group them all
4  as two or more acts constituting a --
5          THE COURT:  So it's because the victim is --
6          THE WITNESS:  Yes.  That's the argument that would
7  allow you to group them all together, the victim being the
8  societal interest that is harmed, which is the harm to the
9  public and the integrity of the judicial process, the criminal
10 justice process.
11         THE COURT:  What you are saying is that's the
12 argument?
13         THE WITNESS:  Yes.
14 BY MR. COMAN:
15 Q.   Actually in subsection (b), though, does it in fact say
16 "when counts involve the same victim and two or more acts or
17 transactions," so it's in the conjunctive?
18 A.   Correct.
19 Q.   Right.  So in order to apply that, you would have to have
20 the same victim?
21 A.   Correct.
22 Q.   Right.  As the probation department has found, they said
23 the public was the primary victim?
24 A.   Correct.
25 Q.   Right.  When we look at subsection (d), Counts 8 and 9,

RACHEL PIERCE - DIRECT

1   § 2B1.1, the traditional money chart, does that section apply
2   to Counts 8 and 9?
3   **A.**   Yes, it does.
4   **Q.**   So is it mandatory that those two counts, 8 and 9, go
5   under subsection (d)?
6   **A.**   Yes.  It says, "Offenses covered by the following
7   guidelines are to be grouped under this subsection."
8   **Q.**   If we have a grouping of Counts 1 through 7 and then a
9   grouping of Counts 8 and 9, what's the result?
10  **A.**   I think there's an argument to be made that then those two
11  count groups would group together, again under Rule B the
12  victim being the public, and all of those acts are part of a
13  common criminal objective.
14  **Q.**   Okay.  So then you would have, is it correct, that -- and
15  correct me if I'm wrong because I'm dazed with this, that's for
16  sure.  When you have a guideline range for Counts 1 through 7
17  that the Court would say it's X -- let's say it's, for
18  argument's sake, 21.  Let's say the guideline range for
19  Counts 8 and 9 would be 18.  Would the Court then, as normal
20  process in accordance with the guidelines, just select the
21  highest one?
22  **A.**   Well, just to be clear, it's not a guideline range; it's a
23  calculation at that point.
24  **Q.**   Correct.  I'm sorry.
25  *A.*   And that's correct, the calculation -- whatever the

1    highest calculation is among all of those counts would control

2    for purposes of grouping, and units then would not be assigned.

3    **Q.**   So in accordance with your testimony, then, there would be

4    no necessity nor applicability to the math that's in the PSR,

5    where you have to assign units and da, da, da?

6    **A.**   Correct.

7    **Q.**   You don't do that.  You go Counts 1 through 7, whatever

8    the guideline calculation is at the end of the day, and then

9    you have Counts 8 and 9, whichever one would be higher, the

10   Court chooses that one and moves on?

11   **A.**   Correct.

12   **Q.**   There's no math project?

13   **A.**   Correct.

14   **Q.**   That's the simplest way I can ask the question.

15            **THE COURT:**  All right.  I'm still stuck because you

16   keep saying an argument is being made.  I appreciate that

17   you're not telling me that this is how it has to be done, but

18   there is an argument to be made.

19                 I'm looking at Counts 1 and 2, "two or more acts

20   or transactions connected by" -- are you telling me one doesn't

21   have to be related to another when you group all of this?

22            **THE WITNESS:**  Well, I think you have to promote a

23   common criminal objective, which I think there's an argument to

24   be made here that there was, you know, a common criminal

25   objective in not maintaining the integrity of the criminal

RACHEL PIERCE - DIRECT

1  justice system.
2          THE COURT:  Okay.  You will equate the actions
3  surrounding the truck with the subornation of perjury in the
4  same common objective?
5          THE WITNESS:  Yes, I think you could.
6          THE COURT:  You could?  Okay.
7          THE WITNESS:  Yeah.  I'm here to speak to the
8  analysis.  I understand there are decisions made, decision
9  points along the way.
10          THE COURT:  Thank you.
11  BY MR. COMAN:
12  Q.    In fact, as the Court pointed out, the truck was
13  prosecuted under § 1519, which is part of the obstruction
14  sphere of criminal statutes under the federal code, correct?
15  A.    Correct.
16  Q.    In fact, it's dealt with the same chapters, correct?
17  A.    Uh-huh.  Right.
18  Q.    As you pointed out.  So when you use the word "argument,"
19  is it in the vein of who is the victim and who did the
20  presentence report and who did the government argue was the
21  victim here?  And as you have seen in the PSR, that was
22  referred to as the public, correct?
23  A.    Correct.
24  Q.    Okay.  In fact, the government said as much in multiple
25  pleadings, correct?

RACHEL PIERCE - DIRECT

1  **A.**   Correct.

2  **Q.**   Okay.  So at the end of the day, in your assessment in

3  looking at the superseding indictment, the sentencing

4  guidelines, all of your training and experience,

5  qualifications, as well as what's in the PSR itself, did you

6  determine or come up with an assessment of what the appropriate

7  offense guideline range should be?

8  **A.**   Yes.

9  **Q.**   What was that?

10 **A.**   An adjusted offense level of 21, a Criminal History

11 Category of "I," which is a range of 37 to 46 months.

12 **Q.**   So without the cross-reference that we talked about

13 before, the guidelines would allow for a two-level enhancement

14 for leadership, correct?

15 **A.**   Correct.

16 **Q.**   It would allow for a two-level enhancement for abuse of

17 trust?

18 **A.**   Correct.

19 **Q.**   Did you include that in your analysis and your assessment?

20 **A.**   I did.

21 **Q.**   The end result was a 21, which would be 37 to 46 months;

22 is that correct?

23 **A.**   That's correct.

24          **MR. COMAN:**  One second, Judge, if I could.

25                 No further questions.  Thank you, ma'am.

RACHEL PIERCE - CROSS

1          THE WITNESS:  Thank you.

2          THE COURT:  Thank you.

3               Mr. Duree.

4          MR. DUREE:  One second.

5                    CROSS-EXAMINATION

6   BY MR. DUREE:

7   Q.   Good morning, Ms. Pierce.

8   A.   Good morning.

9   Q.   Who contacted you to be here today?

10  A.   Mr. Coman.

11  Q.   How did it come about that you got involved in this case?

12  A.   I was working with another consultant that they were

13  working with on this case.  I initially talked to that

14  consultant and then ultimately talked to Mr. Coman.

15  Q.   Are you being paid to be here today?

16  A.   Yes.

17  Q.   Can you tell me how much you are being paid to be here

18  today.

19  A.   My retainer is $2,500.

20  Q.   Can you tell me how much you billed to defense in

21  developing your research and analysis in this case.

22  A.   I can't tell you an exact.  I'm still working those

23  numbers out.  It's been several hours at this point.

24  Q.   So to this point, based on what you know, how much have

25  you billed to defense, if you know?  Not a final bill, but just

RACHEL PIERCE - CROSS

1   to date?

2   A.   I would say close to $2,500.

3   Q.   I want to start by talking about your analysis of

4   grouping.  Your suggestion, if I understood it on direct, is

5   that all counts can be grouped together if there is a societal

6   interest in them.

7        Are you aware that here there were numerous

8   identified individual victims in this case?

9   A.   Yes.

10  Q.   Would that make a difference to your analysis, the fact

11  that there were individual victims in addition to the broader

12  societal interests?

13  A.   Not when it comes to the grouping rules?

14  Q.   Then let me ask you another thing about the grouping

15  rules.  You've suggested that Counts 1 through 7 should all be

16  grouped together.  If we look at Application Note 5 of § 2J1.3,

17  the perjury guideline, Application Note 5 says specifically

18  separate proceedings "includes different proceedings in the

19  same case or matter."  So here, based on that application note,

20  would then a suppression hearing and a separate trial in the

21  same case be separate proceedings as directed by this

22  application note?

23  A.   I believe that would be something the Court would need to

24  decide.

25  Q.   Well, I'm asking you.  You have been providing your

RACHEL PIERCE - CROSS

1    guidance on this, so tell me.  Application Note 5, separate
2    proceedings "includes different proceedings in the same case or
3    matter."  So based on your analysis, understanding that the
4    Court is the final arbiter, would a suppression hearing be a
5    separate proceeding from a trial?
6    A.    I think it's possible it could be.  Then in that case
7    those two counts, those two perjury counts, by applying this
8    special instruction, would not be able to be grouped together.
9    Q.    Okay.  So they would be separate proceedings based on your
10   reading of this --
11   A.    They could be.  I'm not going to make that determination.
12   I think that's for the Court to make.
13   Q.    I want to go back to your reading of the offense at issue
14   and the special instruction for the cross-reference.  I think
15   we could use § 2J1.2 or 1.3, but we will stick with § 2J1.3,
16   and I want to point you to (d)(1), the special instruction.
17           One second.  I'm sorry, (c)(1), the cross-reference.
18   My apologies.
19           "If the offense involved perjury, subornation of
20   perjury, or witness bribery in respect to a criminal offense,"
21   correct?
22   A.    Correct.
23   Q.    "A criminal offense."
24           Look at § 2J1.3(b)(1), which talks about the specific
25   offense characteristics for the crime of conviction.  There it

**RACHEL PIERCE - CROSS**

1    talks about "the offense."  Do you see "the offense" there?

2    A.   I do.

3    Q.   Okay.  That "the offense" is throughout the guidelines.

4    § 2B1.1, the fraud guideline, it comes up all the time, talks

5    about "the offense" when deciding whether to apply specific

6    offense characteristics, right?

7    A.   Correct.

8    Q.   Let's jump over to § 3C1.1 real quick, the obstruction of

9    justice enhancement.  It talks about willfully obstructing or

10   impeding or attempting to obstruct or impede with relation to

11   "the instant offense of conviction," correct?  Do you see that,

12   § 3C1.1?

13   A.   I do.

14   Q.   So when referring to the crime of a defendant's

15   conviction, the guidelines regularly talk about "the offense"

16   or "the instant offense of conviction," correct?

17   A.   There are distinctions, yes.  Uh-huh.

18   Q.   In the cross-reference, it talks about perjury in respect

19   to "a criminal offense."  Do you see that?

20   A.   It's actually in respect to "that criminal offense."

21   Q.   No, it's in respect to -- I'm looking at "if the offense

22   involved perjury, subornation of perjury, or witness bribery in

23   respect to a criminal offense."

24   A.   "A criminal offense."  It goes on to say "apply § 2X3.1 in

25   respect to that criminal offense."

RACHEL PIERCE - CROSS

1  **Q.**   Correct.  Correct.  So focus on the portion I'm asking.  I
2  understand that.
3         The cross-reference says "if the offense involved
4  perjury, subornation of perjury, or witness bribery in respect
5  to a criminal offense."  I'm reading that portion correct,
6  right?
7  **A.**   Correct.
8  **Q.**   Do you have any case law to suggest that the distinction
9  between "a criminal offense" here and "the criminal offense" in
10  all the other portions means nothing and should just be
11  disregarded?
12  **A.**   I don't have case law.  I'm not an attorney, so I don't do
13  case law research.  I still believe that the offense involved
14  in respect to "a criminal offense" --
15  **Q.**   Go ahead.  I'm sorry.
16  **A.**   -- is determinate on the relevant conduct analysis.
17  **Q.**   But you have no legal or guideline support for that?
18  **A.**   I have a guideline support I mentioned back in the
19  definition of "offense" and the relevant conduct.
20  **Q.**   Do you have any guideline support or legal support to
21  suggest that the distinction between "the offense," as you have
22  repeated in the guidelines, and "a offense" doesn't mean
23  anything, that that should just be okay?
24         **MR. COMAN:**  Objection.  Asked and answered, Judge.
25         **THE COURT:**  No, I want to hear it.

RACHEL PIERCE - CROSS

1          **THE WITNESS:**  I don't think there's a difference
2    between "the offense" and "a offense."
3          **MR. DUREE:**  Ma'am --
4          **THE COURT:**  That's not the question, ma'am.
5          **MR. COMAN:**  Judge, she is allowed to answer the
6    question.
7          **THE COURT:**  I know.  I'm trying to get the answer to
8    the question.
9             Do you have any guidelines or legal support to
10   suggest --
11         **THE WITNESS:**  I don't have legal support.  I'm not a
12   lawyer.  I'm not coming in using cases to support my position.
13   I'm relying on my experience with guideline application and
14   that relevant conduct dictates the application of all of the
15   guidelines unless there's some sort of specific instruction
16   otherwise, which I do not see here.  The offense involved
17   perjury, has to establish relevant conduct in respect to a
18   criminal offense.
19   BY MR. DUREE:
20   **Q.**   Ms. Pierce, if I may, I understand that, but again I will
21   repeat my question one more time and please answer it.
22            Do you have any support for the assertion that the
23   distinction between "the criminal offense" as used repeatedly
24   under the guidelines and "a criminal offense" as used in this
25   cross-reference -- do you have any support for the proposition

RACHEL PIERCE - CROSS

1  that that distinction and wording should be obliterated --
2  A.   I guess I don't see the distinction between "the" offense
3  and "a" criminal offense.  I'm not understanding what --
4  Q.   Do you have any support for that, yes or no?  I'm not
5  asking whether you see it.  Do you have anything you can point
6  me to to support --
7        MR. COMAN:  Judge, she has already said the
8  guidelines four times.
9        THE WITNESS:  I can point you to the application of
10  offense and the relevant conduct guideline.  That is my
11  support.
12  BY MR. DUREE:
13  Q.   Again, in § 2J1.3 it talks about an offense.  In § 3C1.1
14  we discuss the application of that two-level enhancement to the
15  "instant offense of conviction."  Do you have any support
16  beyond what you have already said to support an idea that that
17  language, the "instant offense of conviction" and the "a
18  criminal offense" language mean the same thing, that the
19  difference between them should just be obliterated?
20  A.   "Offense," as I mentioned, means the offense of conviction
21  and relevant conduct.  "Offense of conviction," as used in the
22  obstruction guideline is limiting that to the offense of
23  conviction and not using the relevant conduct analysis.  That's
24  the distinction between when the guidelines --
25        THE COURT:  Wait, let her --

1        **MR. DUREE:**  So it sounds like the answer is no to my

2 question of --

3        **MR. COMAN:**  Judge, Judge, can she finish her answer?

4        **THE COURT:**  I just said that, Mr. Coman.  Sit down.

5 They are questions that I'm interested in and I'm going to

6 listen to the answers.

7        **THE WITNESS:**  Can I go?

8        **THE COURT:**  Yes.  I think you were still answering.

9        **THE WITNESS:**  Right.  So the guidelines do make a

10 distinction between "offense," which I think is what's critical

11 here in the application of the cross-reference, what that

12 means, versus "the offense of conviction."  So because the

13 language of the cross-reference says if the offense involved

14 perjury, you're looking at the offense of conviction as well as

15 the relevant conduct.

16 BY MR. DUREE:

17 Q.  Ma'am, do you understand that the answer that you're

18 giving does not, in fact, answer my question?

19        **THE COURT:**  I think we need to move on, Mr. Duree.

20        **MR. DUREE:**  That's fine.

21 BY MR. DUREE:

22 Q.  So under your concept of the cross-reference, let me just

23 lob a hypothetical at you, if I may.  Your suggestion when

24 Mr. Coman was eliciting testimony is that -- if I have it

25 correct -- for the cross-reference to apply, the individual who

1    perjured themselves has to be involved in the underlying
2    offense; is that right?
3    **A.**    Right.
4    **Q.**    So assume a guy is at home watching a football game.  His
5    buddy, without any knowledge of his, goes out and robs a bank.
6    The guy watching the football game then at trial comes in and
7    says, "No, my buddy was with me watching football.  We were
8    watching the Saints.  He didn't rob a bank."  He has then
9    perjured himself, but he is not involved in the underlying
10   offense.  He had no participation in that.  Is it your
11   conclusion that, for that individual, the cross-reference would
12   not apply?
13   **A.**    I think you would possibly need more information.  If you
14   look at the background commentary, to avoid punishment for an
15   offense the defendant has committed -- which in this case has
16   not committed the robbery -- or assisted another person to
17   escape punishment, again based on the relevant conduct
18   analysis, I think you would have to establish a jointly
19   undertaken criminal activity that he was helping him avoid.
20   **Q.**    Ma'am, please help me here.  Focus.  Please focus on the
21   question I'm asking.  This is not a question, to my mind, that
22   relates to relevant conduct, so I'm hoping to confine our
23   analysis here to § 2J1.3, and I specifically want to focus you
24   on § 2J1.3(c)(1), so walk me through this.
25           Based on what you described to defense counsel, it

RACHEL PIERCE - CROSS

1    sounds to me your conclusion would be that guy who lied for his
2    buddy and said his buddy was watching the Saints game instead
3    of robbing a bank, that that guy would not be subject to this
4    cross-reference under your analysis.  Is that correct?
5    A.    Frankly, I would need more information.
6              THE COURT:  Well, I think the question is:  If I am a
7    friend of an offender and I provide a false alibi to anybody,
8    does the cross-reference apply in that situation?
9              THE WITNESS:  I think it potentially could given that
10   the facts support it.  It's out there.
11             THE COURT:  Okay.
12   BY MR. DUREE:
13   Q.    Then are you aware of case law interpreting the
14   cross-reference that says the cross-reference should apply to
15   conduct that creates a potential to derail or miscarry a
16   judicial proceeding?
17   A.    I'm not aware of that case law, no.
18   Q.    That's *Bova*, 350 F.3d 224 at 230.  The cross-reference
19   applies if there is, quote, potential to derail or miscarry a
20   judicial proceeding.  If a defendant lies and obtains a guilty
21   verdict or -- if anyone lies, such a guilty verdict is obtained
22   on false testimony, that would derail or miscarry a judicial
23   proceeding, would it not, false testimony at a judicial
24   proceeding?
25   A.    Yes.  Yes, it would.

RACHEL PIERCE - CROSS

1   **Q.**   Are you aware of the case *United States v. Suleiman*, which
2   is 208 F.3d 32 at page 39?
3   **A.**   I am not aware of that case.
4   **Q.**   That one says that the cross-reference applies to
5   perjury --
6           **MR. COMAN:**  Judge, I would object to the --
7           **THE COURT:**  Is that a question, Mr. Duree?
8           **MR. DUREE:**  Yes, Your Honor, there is.
9           **THE COURT:**  All right.  Well, let's get to the
10  question.
11          **MR. DUREE:**  Okay.
12  BY MR. DUREE:
13  **Q.**   Would perjury at trial result in an inaccurate or
14  incomplete investigation or trial?
15  **A.**   Would it?
16  **Q.**   Would perjury at trial create an inaccurate trial?
17  **A.**   I would think so.
18          **MR. COMAN:**  Judge, "create"?  I have no clue what
19  that even means.
20          **THE COURT:**  I didn't hear you.
21          **MR. DUREE:**  Do you need me to rephrase, Your Honor?
22          **THE COURT:**  No.
23  BY MR. DUREE:
24  **Q.**   Are you aware of case law stating that the cross-reference
25  should apply to perjury that, quote, risks an incomplete or

RACHEL PIERCE - CROSS

1  inaccurate investigation?

2  **A.**   Again, I am not aware of the case law.  As I stated

3  before, guideline application is incredibly fact specific.  So

4  not having read the facts of that case, I can't speak to the

5  rule in that case.

6  **Q.**   As to the facts of this case, you read the PSR and you

7  read the indictment, correct?

8  **A.**   Correct.

9  **Q.**   Were you here for any of the trials in this case?

10  **A.**   I was not.

11  **Q.**   Do you know of any facts related to this case beyond those

12  two documents that you reviewed?

13  **A.**   Other than discussions I have had with those involved on

14  the defense team, that's what I am aware of.  Based on the

15  facts that have been presented to me, I do not believe there's

16  a preponderance of the evidence to support the cross-reference.

17          **MR. DUREE:**  One second.

18               Nothing further, Your Honor.

19          **THE COURT:**  Ma'am, I have a question.  When do you

20  use --

21               Oh, I'm sorry.  Mr. Coman.

22          **MR. COMAN:**  No, Judge, you go ahead first.

23          **THE COURT:**  No, you go, because I'm going to ask a

24  question that's a little off topic.

25          **MR. COMAN:**  I don't think I have any, Judge.

RACHEL PIERCE - CROSS

1          THE COURT:  Okay.  I have a question:  When do you
2    use § 2J1.3(d)(2) which says, "If the perjury, subornation of
3    perjury, or witness bribery resulted in substantial
4    interference with administration of justice, increase by three
5    levels"?
6          THE WITNESS:  Well, I would direct you to the
7    application note that defines "substantial interference with
8    the administration of justice," which includes "premature or
9    improper termination of a felony investigation; an indictment,
10   verdict, or any judicial determination based upon perjury,
11   false testimony or other false evidence; or the unnecessary
12   expenditure of substantial governmental or court resources."
13         THE COURT:  Have you considered that specific offense
14   characteristics in your review of this case?
15         THE WITNESS:  Yes.  I believe that it would apply.
16   It's -- do you want me to go further or not?
17         THE COURT:  No.  I think I've got it.  Thank you.
18         MR. COMAN:  Nothing further, Judge.  Thank you.
19         THE COURT:  Anything further?
20         MR. DUREE:  No, Your Honor.
21         THE COURT:  Thank you.
22             Mr. Coman.
23         MR. COMAN:  Thank you, Ms. Pierce.
24             Yes, ma'am.  Judge, we don't have any further
25   witnesses, but I would like to offer argument at this time if

1   that would be appropriate.

2          THE COURT:  Do you have any witnesses, I'm going to

3   ask the prosecutors, as to guideline application?

4          MR. DUREE:  Unless you want to hear from the

5   probation officer who prepared the report in this case, we

6   don't.

7          THE COURT:  Okay.  Mr. Coman.

8          MR. COMAN:  Yes, ma'am.  Judge, so backing up -- of

9   course, I had to break out this book and make sure I was

10  getting it right.  To cabin it exactly how Ms. Pierce did is

11  the appropriate application, and we start with that base

12  definition of "offense of conviction."

13              So what is the offense?  Well, we have an

14  offense of conviction -- and that's perjury and subornation of

15  perjury, so you have got that -- and/or any relevant conduct.

16  All Chapter 2 and 3 enhancements and/or level offense

17  calculations pivot off of § 1B1.3(a), relevant conduct, and as

18  well as § 1B1.1.  That's the scope of the definition.

19              It does not, as she testified to, extend to some

20  result or consequence.  There are any different factual

21  scenarios where you start with the offense of conviction --

22  which is limited, right.

23          THE COURT:  Uh-huh.

24          MR. COMAN:  The more expansive view is the jointly

25  undertaken criminal activity which contains all acts, someone

1  acting in concert.  The definition has been there for decades,
2  so that's the more expansive.
3          In neither view or approach is there any
4  evidence or distribution of drugs by Mr. Scott with
5  Mr. Perralta, nor was that the government's case, nor was that
6  what's in the PSR.  Their theory was he lied, asked others to
7  lie to help convict and ensure a conviction of Jorge Perralta
8  before Judge Lance Africk.
9          **THE COURT:**  Right.
10         **MR. COMAN:**  That's it.  That's it.
11         To your point, the substantial interference --
12 that's why that's there.  There's two different items in both
13 § 2J1.2 and .3, and you have the more expansive substantial
14 interference, that three-level increase.  That's expansive.
15 That includes all those items that are listed in there and
16 Ms. Pierce just said she would apply.  But here this is a
17 bridge too far to say he, Chad Scott, is rightfully assessed a
18 16-level increase, Jorge Perralta, because that underlying
19 conduct is what's in play.
20         All the cases that the government cited, Judge,
21 in the brief, I read every one of them.
22         **THE COURT:**  Good.  We did too.
23         **MR. COMAN:**  I know you did.  Every one of them, the
24 defendant was involved in the underlying conduct and/or was
25 providing some false alibi --

1          **THE COURT:**  I understand that, Mr. Coman, but there

2     are no cases that say it does not apply.  It's the clear

3     reading of the actual guideline.  This offense involved

4     perjury, subornation of perjury in respect to a criminal

5     offense.  Could they not have said in respect to -- they could

6     have used a more specific term.

7          **MR. COMAN:**  But they used the term "offense," so we

8     go back, and we go back and see what is the definition of

9     "offense."  Under § 1B1.1(I), it's strictly defined to offense

10     of conviction and all relevant conduct under § 1B1.3.  That's

11     it.  That is it.  That's the definition of the term as given by

12     the Sentencing Commission as the guideline.  We can't read

13     anything into it, Judge.

14               So this is what the result would be.  If this

15     cross-reference was applied, literally it would, one, be the

16     first time ever in the United States it was applied to this

17     fact pattern.

18          **THE COURT:**  We don't know that.  We don't know if

19     there hasn't been -- that's the problem is there are no cases

20     either way where the courts say you cannot apply it -- I will

21     tell you, we have looked -- where it's applied or not applied.

22     So this, in my view, appears to be an issue of first

23     sentencing.

24          **MR. COMAN:**  Here's the danger.  To apply it here

25     would literally -- and I'm not trying to be funny -- put the

1    Court in a position of expanding and rewriting that definition
2    in § 1B1.1 of what "offense" means.  It's two things: offense
3    of conviction and/or relevant conduct.  I know I have said it
4    three or four times, and I know Ms. Pierce said it three or
5    four times, but literally that is the triggering event.

6                If the cross-references apply here, the Court
7    would be adding and would be rewriting what is included as an
8    offense.  It is limited to those two items.  There's not an
9    additional definition later on in § 2J1.2 or .3, which they
10   could have put and said:  Hey, by the way, "offense" is going
11   to mean everything under the sun.

12               All those cases that the government cited, you
13   can put them to the side.  The guys were involved.  They went
14   on about Gregory McRae.  He burned the body.  That's what we
15   are talking about in Henry Glover, Judge.  So to do that would
16   be to rewrite that, Judge.

17               **THE COURT:**  Okay.

18               **MR. COMAN:**  In addition, you heard from Ms. Pierce a
19   second issue, a second subissue is the enhancement of two
20   levels for abuses of trust and two levels for the leadership
21   role.  Under § 1B1.5, the PSR says we are going to
22   cross-reference you to the drugs.

23               **THE COURT:**  Well, let me go back to § 1B1.3.
24   "Offense" means the offense of conviction unless a different
25   meaning is specified or is otherwise clear from the context.

1          I guess, from this perspective in reviewing
2   this, is it different that you lie in order to avoid a
3   conviction or you lie in order to obtain a conviction?
4          **MR. COMAN:**  It is.  And it's different because that
5   would be jointly undertaken activity and that's why that
6   commentary is there.  That's why you have no cases where this
7   cross-reference has been applied because whether or not you are
8   convicted is not the point; it's whether or not you were
9   indicted or anything like that.  But when I'm helping someone
10  avoid punishment, just as the background commentary talks
11  about, I'm getting jammed up under § 1B1.3, you see, because
12  I'm helping another escape liability.  That's the hook.  That's
13  where the scope is expansive.
14          I start with my offense of conviction, real
15  tight, put that to the side.  More expansive, § 1B1.3, 1(A) or
16  (B).  (B) is the most expensive.  That's the jointly undertaken
17  activity.  So if I am not involved in that -- if I am involved
18  in that -- and technically you could actually have a situation,
19  Judge, where, let's say, I was dealing drugs with John Doe, and
20  then I go to the police and I falsely implicated John Doe
21  because I had a falling out with him.  I could be held in that
22  situation where I'm actually trying to convict John Doe --
23  provide perjury, ask others to lie, whatever it would be -- and
24  I would be involved in the jointly undertaken activity.
25          **THE COURT:**  No, I understand your argument.

1          **MR. COMAN:**  That's where it is.  You would have to

2     rewrite that, Judge.

3          **THE COURT:**  All right.

4          **MR. COMAN:**  Two, on the multicount adjustment, as

5     Ms. Pierce said, there's no need for a math project.  As the

6     PSR itself says, the public is the primary victim for guideline

7     consideration.  I'm not talking about statutory where you can

8     name John Doe and --

9          **THE COURT:**  I think initially she said it would only

10    be two and she said, no, it would be three.

11         **MR. COMAN:**  No, it would be --

12         **THE COURT:**  Because the suppression is separate from

13    the trial.

14         **MR. COMAN:**  Well, the word is actually "proceeding."

15    The word is "proceeding."  That was one proceeding.  That was

16    one case number in front of Judge Lance Africk.

17         **THE COURT:**  So it doesn't matter if you lie to the

18    grand jury and then lie at trial and lie at a suppression

19    hearing?

20         **MR. COMAN:**  It wasn't a grand jury.  It was all

21    trial.  It was all under that one case number.  Actually, that

22    would be a variance, Judge, if you charged somebody with

23    multiple counts through that, so you couldn't even have that.

24              What does "proceeding" mean, certainly the

25    common language and the common use of the word "proceeding,"

1  whatever that case number was -- in fact, Judge, the motion
2  hearing took place during the trial --
3       **THE COURT:**  Right.
4       **MR. COMAN:**  -- but nonetheless.  So there's no need
5  for a math project, Judge.  With that no need for the math
6  project, the way it's grouped is that the appropriate
7  assessment, as Ms. Pierce testified to, would be whatever the
8  highest guideline range would be, the Court picks that.
9       **THE COURT:**  Got it.
10      **MR. COMAN:**  Even if that didn't apply and we are
11  looking at Counts 8 and 9 in a vacuum, there's issues that we
12  brought up in our objections where they said there was a
13  hundred victims.  I wasn't here for the third trial.  I didn't
14  hear of a hundred victims.  There certainly was no
15  preponderance of the evidence naming a hundred people.  In
16  fact, the PSR, I believe, listed two.
17           In addition, Judge, the $98,000 value, I don't
18  know where that came from.  I wasn't part of that, but
19  nonetheless --
20      **THE COURT:**  Right.
21      **MR. COMAN:**  Judge, if I could, one moment before I
22  rest, I want to make sure with Mr. Miller.
23           Judge, if I can kind of transition and let
24  Mr. Miller talk about Counts 8 and 9 since that was his
25  bailiwick.  Thank you.

1          **MR. MILLER:**  I will be literally one minute.

2          **THE COURT:**  You have one minute because we had this

3    conversation ahead of time.

4          **MR. MILLER:**  Yes, I know.  Right, and so this is my

5    role.

6                Judge, the specific objection was to

7    paragraph 73 of the PSR dealing with $98,000 and a hundred

8    victims.  Your Honor, paragraph 73 says based on trial

9    testimony concerning underreported drug seizure proceeds, that

10   was $80,000 of the $98,000.  There was no trial testimony

11   that's cited.  There's no evidentiary basis for this.  The

12   focus of the trial was the conversion of personal property of

13   arrestees, not drug seizure proceeds.  There's no evidentiary

14   basis and improper.

15               In fact, in Mr. Duree's closing argument he

16   spoke to ashes and embers of the personal property, of the

17   photographs of the DEA office of Mr. Scott's workspace, of

18   being the items of personal property that were converted.  That

19   would go to the value and that would also go to the number

20   later on in paragraph 73.

21         **THE COURT:**  But wasn't there testimony that they were

22   pilfering from proceeds and they would share some of that money

23   on a regular basis?  So there was testimony.  I don't know if

24   we --

25         **MR. MILLER:**  There was testimony from Mr. Newman on

1   that point, Your Honor.  He was impeached on that point, if you

2   recall, based on a prior inconsistent statement.  There is no

3   evidentiary basis cited in the PSR to support that.

4            Your Honor, as you know, the underlying

5   indictment, there weren't elements of this crime of value or of

6   number of victims.  It wasn't set forth in the underlying

7   indictment.  It wasn't an element of the case.  I think the

8   only way that evidence came out was through the testimony of

9   Mr. Newman, which we objected to.  That objection was

10  overruled, and then we impeached him based on a prior

11  inconsistent statement.  Later on in paragraph 73 it speaks to

12  a hundred wallets.  There was only evidence of two wallets.

13  Those were specific trial exhibits, Your Honor.  Thank you.

14            **THE COURT:**  Thank you.

15            Mr. Duree.

16            **MR. DUREE:**  Your Honor, I'm going to devote my time

17  here principally trying to walk through with you the

18  cross-reference and --

19            **THE COURT:**  I think that's where my greatest concern

20  is, to be perfectly frank with you.  Let me just cut to the

21  chase, Mr. Duree.

22            I've looked at this again and again and again

23  and again, and it's very difficult.  I'm wondering if it makes

24  sense -- and let me tell you why -- because the reference

25  brings you to accessory after the fact.  Isn't it so when

1   someone perjures himself on behalf of -- let's go back to my

2   buddy that I'm watching the football game with.  He goes and

3   does something, comes back.

4          You didn't send him to do it.  You didn't know

5   it was going to happen, but he told you, "Guess what I did.  I

6   have a thousand bucks in my pocket to show you."  You are,

7   indeed, acting as an accessory after the fact.  So I'm

8   wondering if, in this cross-reference, does it make sense in

9   this context where he wasn't -- is my question making any

10  sense?

11          **MR. DUREE:**  It is.  It is, Your Honor.

12          **THE COURT:**  When you reference to that accessory

13  after the fact, you are indeed acting in that capacity.  Are we

14  trying to force this into a cross-reference when it doesn't

15  actually fit?

16          **MR. DUREE:**  Your Honor, we are not.

17          **THE COURT:**  Explain it to me.  On the other hand, I

18  look at the clear reading and it appears to me that it does

19  apply.

20          **MR. DUREE:**  One second, Your Honor.

21          Your Honor, the most on point case that I was

22  able to find on this one is *United States v. Martinez*.  That's

23  a Fifth Circuit case that I would imagine the Court has

24  probably seen by now.  We cited to it.  It's 106 F.3d 620.  I

25  believe it's at page 622.  When they are talking about why you

1   don't have to be convicted as accessory after the fact for the

2   cross-reference to apply, they note that the cross-reference

3   just borrows the formula from § 2X3.1.  That's all.

4         **THE COURT:**  Right.

5         **MR. DUREE:**  There is not any insinuation in there

6   that the person had to be an accessory after the fact.  It's

7   just pointing you in that direction simply to utilize that

8   formula.  So even though that formula is captured under the

9   heading "Accessory After the Fact," I was not able to find any

10  case law suggesting that a person had to be an accessory after

11  the fact or in any way friendly to the defendant.  I looked for

12  that because, if our point was wrong, I wanted to find the case

13  law, and I didn't.

14          The most on point case I could find was

15  *Martinez*, which led me to the conclusion, when I looked at

16  page 622, that this is a borrowing of a formula and is just a

17  mechanical application; if this type of obstruction happened,

18  then use this formula, period.  That's my understanding based

19  on the case law there.

20          I will say that there were several cases that I

21  was able to find suggesting that an individual didn't have to

22  be convicted of accessory after the fact or anything like that

23  for the guideline to apply.  I think those are telling here.

24        **THE COURT:**  Right.  You don't necessarily have to be

25  convicted of it or charged with it, but are you acting

1  basically in that capacity?

2          **MR. DUREE:**  See, Your Honor, I believe that it makes

3  absolutely no difference, and I will tell you why.

4          **THE COURT:**  Please.

5          **MR. DUREE:**  We are all in agreement none of us have

6  been able to find case law applying these specific facts.  So

7  what I tried to do was look back and think:  Okay.  What is the

8  purpose of the perjury guideline?  What's the criminal conduct

9  that is supposed to be more severely punished here?  Does

10  Defendant Scott's conduct fall within that?  I found the answer

11  is yes.

12          I reference you to a couple of the cases that I

13  spoke about with the witness.  *United States v. Suleiman* says

14  that the purpose of the cross-reference at issue is to treat

15  more severely perjuries that "risk an incomplete or inaccurate

16  investigation or trial of a criminal offense."  So there what

17  I'm seeing is that the cross-reference isn't about whether you

18  helped the defendant or whether you helped the prosecution.

19  The cross-reference recognizes the magnitude of perjury, and

20  the cross-reference criminalizes conduct that undermines

21  judicial proceedings and thus corrupt the rule of law.

22          Based on that, it applies to perjuries that

23  "risk an incomplete or inaccurate investigation or trial of a

24  criminal offense."  Defendant's conduct created that.  We had

25  an inaccurate trial in Mr. Perralta's case.  That's a

1    Second Circuit case.

2                    The same with *United States v. Bova* out of the

3    First Circuit, 350 F.3d 224 at page 230.  Courts have

4    considered the cross-reference, quote, based on the potential

5    of the perjury to derail or miscarry a judicial or similar

6    proceeding of another crime.

7                    So, again, the focus of the cross-reference

8    isn't did the defendant get help or did the government get

9    help; the purpose of the cross-reference is to enhance the

10   punishment for lies that create a miscarriage of a criminal

11   proceeding, period.  It's the sanctity of the proceeding that's

12   the seed from which everything else grows.  It's not did the

13   defendant get help or did the government.

14           **THE COURT:**  That's what I have been struggling with.

15   I think it's because the cross-reference brings us to accessory

16   after the fact and it's like is this what you're -- is this

17   almost, in fact, the conduct that you're engaging in by

18   committing perjury.  There was no accessory after the fact in

19   this case.

20           **MR. DUREE:**  Correct.

21           **THE COURT:**  It was the opposite.

22           **MR. DUREE:**  Correct.

23           **THE COURT:**  Would it not be -- and I'm asking.

24           **MR. DUREE:**  Yes, Your Honor.

25           **THE COURT:**  Instead of the cross-reference, I add the

1    three levels for the specific offense characteristic?

2            MR. DUREE:  Which specific offense characteristic,

3    Your Honor?

4            THE COURT:  (d)(2), "if the perjury, subornation of

5    perjury, or witness bribery resulted in a substantial

6    interference with administration of justice."

7            MR. DUREE:  Yes, Your Honor, that could be applied,

8    but I will tell you why it doesn't apply here.

9            THE COURT:  Why?

10           MR. DUREE:  Because the cross-reference at (c)

11   provides you an alternative.

12           THE COURT:  Right.

13           MR. DUREE:  An alternative that creates a higher

14   level of punishment.  So the way I read it, what the guideline

15   is saying is we are going to start at a 14.  Then if there was

16   perjury that resulted in a substantial interference of justice,

17   as in this case, we are going to add three levels.  That gets

18   you to a 17, but then you have the cross-reference specifically

19   to address instances of perjury in cases of a heavier

20   magnitude.  It's a recognition on the part of the guidelines --

21           THE COURT:  Right.

22           MR. DUREE:  -- that a murder that started at a

23   level 40, that's only a level 43, deserves more than a 17-level

24   punishment if there's perjury therein.  So to me you could

25   apply that and you would get to 17, but then you're bound still

1   by this cross-reference which says, okay, it did involve
2   perjury in respect to a criminal offense, so check and check.
3   But now I'm going to look back at the underlying crime and see
4   if the offense for the underlying crime is higher than that 14
5   plus 3, or 17, and that's the one that I'm going to apply.  I'm
6   going to apply the higher guideline because the underlying
7   crime to which the perjury relates was more severe.  It's an
8   alternative.  It's 17 or higher if the underlying crime is
9   higher.  So that's the way that I work through those.
10          **THE COURT:**  Right.
11          **MR. DUREE:**  A couple other points, Your Honor, just
12   because I feel like things got a little bit muddied and I would
13   like to clear it as best I can, hopefully not further muddy.
14              The defense suggested that you would be
15   basically rewriting the law if you applied the cross-reference
16   in the way that the probation officer recommended and that we
17   are supporting, but you wouldn't be rewriting it.  It's just
18   the plain language.
19              I don't want to tread on higher ground here, but
20   the cross-reference is really clear on its plain language.  It
21   just says, "If the offense involved perjury, subornation of
22   perjury, or witness bribery in respect to a criminal offense,
23   apply § 2X3.1."  There can be no doubt that the defendant's
24   perjury and subornation of perjury were done in respect to
25   Jorge Perralta's trial.  That's a criminal offense.

1          So on the plain language of what (c)(1) says and
2    again on the plain language of (c)(1) for § 2J1.2, the
3    cross-reference for obstruction of justice, on both of those
4    the plain language, it falls right in, this perjury in relation
5    to a criminal offense.  We are done.  To go beyond that and
6    read other things into it is more than the guidelines require.
7          An additional piece is defense counsel and their
8    witness have talked at some length about § 1B1.3, relevant
9    conduct, that kind of thing.  I just want to be really clear
10   that our opinion, as the government, is § 1B1.3 has no
11   relevance or application here.  This isn't a crime in which
12   relevant conduct is at issue.
13          Any interpretation of relevant conduct, whether
14   it's right or wrong, I'm candidly not even really addressing
15   that because, quite simply, interpretations of § 1B1.3 have no
16   value here.  This isn't an issue of relevant conduct.  This is
17   an issue of simply applying § 2J1.3(c)(1).
18          The last thing that I would sort of suggest in
19   reading through it is it's my reading that if defense counsel's
20   position were to prevail, that you would in a lot of cases be
21   making the separate specific offense characteristic under
22   § 3C1.1 totally irrelevant.
23          § 3C1.1 is the specific offense characteristic
24   for obstruction, for obstructing or impeding the administration
25   of justice.  So if § 2J1.3 could only apply in the instances

1    that defense is suggesting, you would be basically reading
2    § 3C1.1 and the subset of cases out of relevance, and that
3    doesn't make any sense.
4              The very last thing and then I will stop, unless
5    you have any questions for me, is just that what I think can't
6    be countenanced is this.  Defense counsel's position suggests
7    something that I think has to be fundamentally incorrect at the
8    very foundation of the law, which is that we care more about
9    some perjuries than others; some perjuries are bad and others
10   aren't so bad.  It's an absurd result, right?
11             If a woman is charged with trafficking cocaine
12   and her boyfriend perjures himself at trial and affects the
13   outcome, that perjury is the same and must be punished because
14   it is an insult and a disrespect to the administration of
15   justice and undermines the rule of law.  It makes no difference
16   who he perjured himself for.
17             What the defense is asking for here is a
18   situation where if that boyfriend perjured himself to create an
19   alibi for his girlfriend because he loves her, then he is in
20   the soup with her; he is getting this huge enhancement.  He is
21   going to be lit up.  But if they had a falling out and he lies
22   to put her at a drug deal because now he hates her, all of a
23   sudden that's not so bad.  That will help the government, so
24   that's just going to be a small perjury, as we call it.
25             There's this huge gap between one type of

perjury and another type of perjury, and I suggest to
Your Honor that the law doesn't support that.  It would be
wrong to suggest that some types of perjury are more wrong than
other types of perjury.  It's the insult to the administration
of justice and the corruption of the proceeding that warrants
this enhancement.

        **THE COURT:**  Thank you.

        **MR. DUREE:**  I know I was kind of bouncing around, so
if there's anything else you want me to address or anything
else I should talk about, just tell me.

        **THE COURT:**  No.  Thank you.

        Perhaps we should visit on the side.

        (Off the record.)

        **THE COURT:**  After having considered argument on the
application of the guidelines, I am going to defer that ruling
because there is a great deal more information that I want to
review.  As I indicated this morning, the presentence report
came to me late, and that was through no fault of anyone.  It
was the desire of all parties that we proceed with the date in
hand.  As a result, it's come late.  The objections were filed
late.  The response to the objections were filed late last
night.

        We are working through this.  When I say "late,"
I do not mean that in any way to sound like I think anyone has
not been diligent in reviewing and responding.  It was,

1  frankly, just the nature of the beast and the deadlines that we

2  imposed on ourselves.

3          With that, I am going to defer.  I know that the

4  parties have other witnesses that they would like to present.

5  My belief is that these are to address the § 3553 factors.

6          With that, Mr. Duree and Mr. Miracle, are you

7  ready to proceed?

8          **MR. DUREE:**  Yes, Your Honor.  Can I ask one quick

9  question on the objection before we proceed with our witnesses?

10          First, I realize that I spent my time talking

11  about cross-references.  I did not address the grouping or the

12  loss --

13          **THE COURT:**  What I would like to hear from you is

14  about the loss as opposed to the grouping.  Let's discuss the

15  loss.  I've read the briefing on the grouping and I'm fine with

16  where we are on that.

17          **MR. DUREE:**  Can I take another minute or two?

18          Mr. Miracle has on his computer the chart that

19  we submitted to Your Honor last night.  It might be beneficial

20  to have that.

21          **THE COURT:**  Okay.

22          **MR. DUREE:**  So, Your Honor, here's how we believe the

23  loss figure gets to the point that it does.  There's sort of

24  two pieces here.

25          One, I want to start with specific dollar

1    amounts that were mentioned in the June 2021 trial.  After

2    that, I will step into the calculations for the full dollar

3    amount that we came up with based on testimony.

4              Here are specific losses that were referenced.

5    James Williams said that he had $76,000 when he was arrested

6    and that the paperwork that was turned into the DEA -- the

7    DEA's paperwork listed only about $47,000 and something, so it

8    was a discrepancy of a little over $28,000.

9              Dameion Dotey said that when his money was

10   seized, he had $16,000, and that there was only $5,900

11   reflected in the DEA report.  That creates a discrepancy of

12   $10,100.  Dr. Dotey also mentioned that the money was taken

13   from his person.  Mr. Whittington said the same thing.

14             Karl Newman testified about the either $4,700 or

15   $4,800 that they removed from the wallets on the night in

16   January 2016 when they were getting rid of the wallets,

17   throwing things in the swamp, and that's the money they used to

18   pay Garry Jordan.

19             So based on those specific instances, we have a

20   little over $53,000, $53,500 and change based just on specific

21   dollar amounts recalled by those witnesses.  But then from

22   there we know that that's only a very, very small fraction

23   because from there, to make our calculations, we are relying on

24   the testimony principally of Mr. Newman.

25             Mr. Newman described that there was a scheme to

1   steal money from the wallets of arrestees throughout the
2   charged time frame, 2009 to 2016.  He mentioned that the money
3   would frequently get into the thousands, and he spoke about how
4   one time Defendant Scott took $2,000 for spending money when he
5   was going to Spain.  Mr. Newman also testified that this would
6   happen a few times a year every -- I think he said three or
7   four times a year, so that's on wallets.
8           Then when we get to the seizures, Mr. Newman
9   testified that they would skim money off of seizures when the
10  opportunity struck, and I believe it was again around a few
11  times a year.  He said that they might take $5,000 or $10,000
12  and divide it into three -- Mr. Newman, Defendant Scott,
13  Mr. Gemar -- and that over the years they did this several
14  times a year.
15          We have confidence that the dollar amounts for
16  the seizures are accurate or, in fact, understate the loss
17  because we know from Mr. Dotey and Mr. Williams that it was
18  about $10,000, about $28,000 taken from them.  So that gives us
19  confidence that the amounts that Mr. Newman was talking about,
20  $5,000 or $10,000 at a time, definitely add up or potentially
21  really understate the overall amount.
22          With that confidence, then, we just calculated
23  based off of Mr. Newman's testimony:  Assume $1,000 per wallet
24  pilfering session three times a year over the life of the
25  conspiracy.  I think we might have even made a conservative

estimate of $750, let's say, and about 24 times over -- you
know, three times a year over eight years, a conservative
estimate from seizures of $5,000 per timetable, the lowest
amount that was mentioned, lower than either of the seizures
referenced, twice a year, which seems to be a conservative
estimate of how often it happened.

Then we took those numbers, $750 from the wallet
24 times over the course of eight years; 16 seizures, which
equates to two a year, of $5,000 each, which is low; and that
gives us $18,000 from the wallets and $80,000 from the
seizures.  That gets to $98,000, which is the figure that's
driving the guideline range.

As I talk to you right now, I can tell you that
that number satisfactorily reflects the severity of the loss, I
suppose.  It works as a guidelines figure, but we believe that,
if anything, that number is deeply, deeply conservative and
understates the loss; because whereas Mr. Newman talked about
$2,000 taken out of the wallets just for Chad to go to Spain,
you know, $1,000 or more each time, we ratcheted that number
down to $750.  We went below his estimates.

On the seizures again, Mr. Williams said over
$28,000 was missing.  Mr. Dotey said over $10,000 was missing.
We pushed that way down to just $5,000 per seizure.  So we made
very conservative estimates of the dollar amounts and of the
number of times it happened.  We calculated that way with

confidence in those numbers that stems from the fact that we
had specific witnesses -- Mr. Williams, Mr. Dotey,
Mr. Newman -- talk about individualized seizures that, you
know, corroborated our numbers, made them look very defensible,
and if anything overly conservative.  So that's how we got to
that.  If there is any more you want on the calculation --

        **THE COURT:**  No.

        **MR. DUREE:**  I know we sent it late last night, but
Mr. Miracle did attach a chart that reflects the same points
that I'm speaking to.

        **THE COURT:**  I have it.

        **MR. DUREE:**  Did you receive that?

        **THE COURT:**  I did.  I did.  Thank you.

        **MR. DUREE:**  That's it, Your Honor.

        **THE COURT:**  Please call your first witness.

        **MR. MIRACLE:**  The government calls Julius Cerdes.

                    **JULIUS CERDES,**
having been duly sworn, testified as follows:

        **THE DEPUTY CLERK:**  Please be seated.  State and spell
your name for the record.

        **THE WITNESS:**  Julius Cerdes, J-U-L-I-U-S,
C-E-R-D-E-S.

        **MR. MIRACLE:**  May I proceed?

        **THE COURT:**  Please.

1                     **DIRECT EXAMINATION**

2    **BY MR. MIRACLE:**

3    **Q.**    Mr. Cerdes, where do you reside?

4    **A.**    38701 Hebert Lane, Ponchatoula, Louisiana.

5    **Q.**    I'll ask you to keep your voice up.  The mask is muffling

6    it a little bit.  I can hear you now, but just as we keep

7    going.

8    **A.**    Yes.

9    **Q.**    Do you know the defendant, Chad Scott?

10   **A.**    I do.

11   **Q.**    I would like to draw your attention specifically to

12   November of 2005.  Did you have interaction with Mr. Scott on

13   that day?

14   **A.**    I did.

15   **Q.**    Can you tell the Court what happened.

16   **A.**    I was returning home in the middle of the night,

17   somewheres approximately 11:00 at night to my home, and upon

18   arriving I was arrested by Agent Scott.

19   **Q.**    Okay.  Where were you arrested?

20   **A.**    At my home.

21   **Q.**    Was anyone with you?

22   **A.**    Yes, he was.

23   **Q.**    Who was it?

24   **A.**    Charles Tilley.

25   **Q.**    Could you just briefly describe to the judge the setup

1   between your house and any other buildings you have there.

2   A.   Adjacent to my house is a 5,000 square foot

3   workshop/warehouse approximately 30 feet from the house,

4   parallel with the house, with the carport, two-car carport.  So

5   sitting underneath the carport, you can directly see the door,

6   the side door of the shop, and both the vehicles under the

7   carport.

8   Q.   When you say "shop," it's like a 5,000 square foot

9   warehouse, basically?

10  A.   Correct.

11  Q.   Did you find out later what was the reason why you were

12  arrested that night for drugs and whose drugs they were?

13  A.   Yes, I did.

14  Q.   Whose drugs were they and what were the circumstances of

15  that?

16  A.   When I drove up and exited the vehicle, me and Charles

17  Tilley was parting ways.  He was heading to his vehicle.  I was

18  going inside.  We was basically ambushed from behind my house

19  by Chad Scott and his team, arrested and handcuffed.  My shop

20  door was immediately opened up, and they had a team in there

21  dismantling a vehicle of someone that I knew.  He told me I was

22  under arrest for whatever was in his vehicle and --

23          THE COURT:  Wait.  I'm sorry.  They were dismantling

24  your vehicle?

25          THE WITNESS:  No, ma'am.  A vehicle that they had in

JULIUS CERDES - DIRECT

1   my shop/warehouse.
2           THE COURT:  Had you put the vehicle in the warehouse?
3           THE WITNESS:  No, ma'am.
4           THE COURT:  Okay.  Thank you.
5           THE WITNESS:  From my understanding, Agent Scott did.
6           THE COURT:  All right.  Proceed.
7   BY MR. MIRACLE:
8   Q.   Was that an individual from whom you had bought marijuana
9   from in the past?
10  A.   Yes, it was.
11  Q.   Did you arrange something for that evening, to buy
12  marijuana from that individual?
13  A.   No, I did not.
14  Q.   Did you have a firearm on your person when you were
15  arrested?
16  A.   Yes, I did.
17  Q.   Why did you have a firearm?
18  A.   Coming and going in the middle of the night from a remote
19  highway in between Manchac and Ponchatoula where I would keep
20  my boats at -- and this was shortly after Katrina with a lot of
21  mayhem going on -- I always carried a firearm, you know, in my
22  travels in the middle of the night like that, loading and
23  unloading in the middle of the night.
24  Q.   You were carrying items that were of value?
25  A.   Yes.  As a matter of fact, that night I was arrested I had

JULIUS CERDES - DIRECT

1    $1,900 in my possession.

2    **Q.**    Did Chad Scott plant evidence on you that evening?

3    **A.**    Absolutely did.

4    **Q.**    All right.  Tell me first, when they got there, did they

5    ask you if they could search your truck?

6    **A.**    Actually, he asked would I sign a consent to search, and I

7    told him --

8    **Q.**    Did you do that?

9    **A.**    I did not.

10   **Q.**    What happened next regarding the search of the truck?

11   **A.**    I guess about an hour or so later they obtained a warrant.

12   I was sitting on the vehicle that was at my home, on the

13   tailgate of it.  And the vehicle that I had drove up in was

14   underneath the carport beside where I was sitting and I had a

15   clear view of the shop and stuff.  They drove up with the

16   warrant.  He told them to search the vehicle.  Three agents and

17   a dog thoroughly searched the vehicle and never found anything.

18          I would say maybe an hour or so later, I seen

19   Agent Scott and Heath Morton gathered up outside the side door

20   of my shop.  I seen Agent Scott grab Heath Martin by the arm

21   and walk him over to the vehicle.  The doors was already opened

22   from the previous search and he announced, "Here it is.  Y'all

23   don't know how to look," or something of that nature.

24          At that time he hollered for them to come take a

25   picture of it and they did.  Then he came holding a gallon zip

JULIUS CERDES - DIRECT

1   lock bag with approximately an ounce or so of marijuana in it
2   plus a pack of rolling papers and pointed in my face and said,
3   "Now you are going to do more time than the Mexican in your
4   shop."
5   Q.   Why were you going to do more time than the Mexican with
6   the marijuana in your shop?
7   A.   He informed me now he had me on a gun protecting drugs
8   charge.
9   Q.   Because you had a firearm?
10  A.   Because I had the firearm.
11  Q.   Were you aware at that time that there were enhanced
12  punishments for having a gun located with drugs?
13  A.   Absolutely.
14  Q.   Did you have marijuana on your property that night?
15  A.   I did.
16  Q.   The marijuana that Chad Scott said that he found in your
17  truck, was that your marijuana?
18  A.   No, it was not.
19  Q.   Was it in your truck?
20  A.   No, it was not.
21  Q.   Did you have a gun anywhere near the marijuana that was in
22  your shop?
23  A.   Absolutely not.
24  Q.   Did they subsequently find the marijuana that was in your
25  shop?

JULIUS CERDES - DIRECT

1    A.    They did.

2    Q.    Approximately how much was that?

3    A.    About an ounce or so.

4    Q.    What is your understanding of what the possible punishment

5    for that amount of marijuana would be?

6    A.    Misdemeanor, a fine.

7    Q.    That same evening did Chad Scott steal money from you?

8    A.    He did.

9    Q.    Can you tell the Court how that happened.

10   A.    Once he got the warrant and I watched them plant the

11   evidence and stuff, they still had me right there on the

12   tailgate of my truck.  When you go in my carport door, there's

13   a game room there, and I had a large gun safe there.  No one

14   had the combination to that safe but me.  It's a safe that I've

15   had probably 30 years prior to that incident.

16   Q.    Did you at some point open that safe for Defendant Scott?

17   A.    He took me off the tailgate, unhandcuffed me, and walked

18   me inside.  First he asked would I open the safe, and I told

19   him yes.  He had the warrant, so I opened the safe.  I told him

20   the only thing in there is, you know, guns and $5,000 with the

21   receipt, and where the money had come from was the sale of a

22   vehicle.

23   Q.    You knew that was $5,000?

24   A.    Absolutely.

25   Q.    Did you subsequently learn of any money seizures that had

JULIUS CERDES - DIRECT

1  happened that evening from your house?

2  **A.**   Yes, I did.  They mysteriously had $1,500 missing.

3  **Q.**   So the declared amount was $3,500?

4  **A.**   Yes.

5  **Q.**   Had all $5,000 been taken from the safe?

6  **A.**   Yes, it was.

7  **Q.**   Were you eventually charged for the marijuana charge, for

8  the drugs that were in the shop?

9  **A.**   I was.

10  **Q.**   Did you subsequently get out on bond?

11  **A.**   I did.

12  **Q.**   All right.  Let's go back to Mr. Tilley, the gentleman who

13  was with you that night.  Did you have a conversation with

14  Mr. Tilley about the arrest after you got out on bond?

15  **A.**   Yes, I did.

16  **Q.**   What did Mr. Tilley tell you about the marijuana?

17  **A.**   Mr. Tilley informed me that the marijuana that was found

18  in my truck, that I witnessed them put in there -- because at

19  first I thought it was pretty much the same description of what

20  was in my shop.  I thought they had found the marijuana in my

21  shop and were just trying to trump up the charges to make it

22  look bad on me from what they found in the shop.  But while I

23  was in jail, my wife informed me that they found the marijuana

24  in the shop, showed it to her, and so that's where I assumed it

25  came from because it had the same description of what was in my

JULIUS CERDES - DIRECT

1    shop.

2         But when I got out, Charles Tilley informed me that

3    the marijuana that was in my truck was what I witnessed him put

4    in his boot after he had taken a shower and me and him had got

5    in the vehicle together and drove to my house.  He said that he

6    had gave the marijuana to Heath Martin because he assumed he

7    was going to jail.  Heath Martin come back to him and told him

8    that, "The marijuana was found in Julius' truck.  You're free

9    to go.  Now leave."

10   Q.   Did Chad Scott ever talk to you after that about providing

11   false testimony against someone else?

12   A.   Yes, he did.

13   Q.   Can you tell the Court about that.

14   A.   Upon my arrest, there was three boats seized from my

15   residence, and they was being stored at the Tangipahoa Parish

16   sheriff's station in the yard behind it.  He called me up there

17   to supposedly winterize the boat and had a conversation with me

18   about a prior arrest that he had made of someone that I knew

19   and wanted me to say that I had sold them cocaine and make it

20   believable.  He was having a meeting with me and my attorneys,

21   and at that meeting that's what I did.

22   Q.   Did you know that that individual had purchased cocaine?

23   A.   I did know it.

24   Q.   Did that happen on your property, in fact?

25   A.   It did.

JULIUS CERDES - DIRECT

1   **Q.**   Were you the person that had sold him cocaine?

2   **A.**   No, I was not.

3   **Q.**   But you're saying that Defendant Scott asked you to say

4   that you were the person that sold it to him?

5   **A.**   He did.

6   **Q.**   Did you agree to do that?

7   **A.**   I did.

8   **Q.**   Why did you agree to do that?

9   **A.**   Because that was part of what the deal he had made with me

10  about giving me my boat that he had seized from me back.

11  **Q.**   Did you later make a statement regarding selling that

12  individual cocaine?

13  **A.**   I did.

14  **Q.**   Who was your attorney at the time?

15  **A.**   Garry Jordan.

16  **Q.**   How did that statement come about?

17  **A.**   They brought me up there and wanted to know any

18  information that I had about any kind of drug activity.  I told

19  them that I had information about it, and I informed them

20  that -- I told them that I sold the guy that he wanted me to

21  say that I sold it to the cocaine.  It was William Villa.

22  **Q.**   Did Defendant Scott follow through on his part of the deal

23  that you had made?

24  **A.**   No, he did not.

25  **Q.**   How do you know that?

JULIUS CERDES - DIRECT

1  A.   Because right after that meeting he stood up and said,
2  "Now he is an admitted drug dealer.  I'm not giving him the
3  vehicles back," the boats.
4  Q.   Did you do anything as a result of that?
5  A.   Yes, I did.
6  Q.   What did you do?
7  A.   I filed an internal affairs investigation about the money
8  he had stole, the drugs he had planted, and him coercing me
9  into saying what I had went in front of my attorney to say for
10 him.
11 Q.   Did you ultimately plead guilty to the possession of
12 marijuana charge?
13 A.   I did.
14 Q.   Why did you do that?  Well, were you guilty of that?
15 A.   No, I was not.
16 Q.   For the amounts that you pleaded guilty to?
17 A.   No, I was not.
18 Q.   Why did you plead guilty to it?
19 A.   I pled guilty to it because upon me making the statement
20 that I had sold William Villa the cocaine, that was admitting a
21 drug deal.  I had state charges on me that I was on bond for
22 with the possession of marijuana with the intent to distribute,
23 what Chad Scott had arrested the fellow in my warehouse for.
24 Upon making that statement about selling the cocaine, I still
25 had another month or so left before my arraignment.  So he

JULIUS CERDES - DIRECT

1  immediately put distribution of cocaine charges on me and then
2  I was faced with a half-a-million-dollar bond.
3          So during that time when he put them charges on me
4  and me being out, he sent a team to my 79-year-old mother's
5  house, who lived next door to me, and repeatedly harassed her
6  if I did not turn myself in on them charges, they was going to
7  arrest her.
8  Q.   At some point were you offered a plea agreement on the
9  marijuana charges?
10 A.   I was after I spent -- my charges went from state to
11 federal.  When I went to federal court and was arraigned on the
12 marijuana charges and the gun protecting the drugs charge, I
13 was denied bond and I had to sit in jail.
14         The nine months that I sat in jail, the investigation
15 was ramping up because the investigators had spoke with Charles
16 Tilley and polygraphed him, and my attorney.  And they wanted
17 the investigation stopped, so they wrote an agreement to me.
18 "Accept the plea for the 18 months on the marijuana and we will
19 drop the gun charge, or we are going to take you to trial and
20 go to 78 months."  So at this point I'm nine months into it,
21 I'm looking at the downhill side of it, and I'm ready to get
22 back to my family.
23 Q.   As part of that criminal agreement, did you also agree to
24 dismiss the complaint that you had filed?
25 A.   I did.

JULIUS CERDES - CROSS

1   **Q.**   So as you sit here today, you are a convicted felon
2   because of that?
3   **A.**   Yes, I am.
4   **Q.**   Were you subsequently convicted of another felony?
5   **A.**   I was.
6   **Q.**   Mr. Cerdes, do you believe your treatment by Chad Scott
7   during these events was fair?
8   **A.**   Nowhere near fair.
9   **Q.**   Why not?
10  **A.**   He fabricated evidence, coerced me into making a statement
11  I shouldn't have made, and used the law to his own ability to
12  have me pressured into doing what I had done.
13          **MR. MIRACLE:**  I pass the witness, Your Honor.
14          **THE COURT:**  Thank you.
15             Mr. Garcia.
16                        **CROSS-EXAMINATION**
17  BY MR. GARCIA:
18  **Q.**   Good afternoon, Mr. Cerdes.  How are you?
19  **A.**   Fine.  And you?
20  **Q.**   Good.  Thank you.
21          Sir, I just want to make sure I understand what
22  happened here.  It's your testimony that Agent Scott and a team
23  arrived at your home, and you had a weapon in your possession
24  because you were protecting your property.  Did I understand
25  you correctly?

JULIUS CERDES - CROSS

1    **A.**    I was protecting myself.

2    **Q.**    You had no idea that your home was about to be raided?

3    **A.**    None whatsoever.

4    **Q.**    You have a wife, do you not?

5    **A.**    I do.

6    **Q.**    Her name is Melissa?

7    **A.**    That's right.

8    **Q.**    Now, you knew prior to Agent Scott and his team coming to

9    your home on that evening that, in fact, they were coming to

10   your home on that evening to seize, I believe it was, 50 pounds

11   of marijuana?

12   **A.**    I had no idea.

13   **Q.**    In fact, they recovered 50 pounds of marijuana from that

14   warehouse of yours sitting right next door?

15   **A.**    That's not true.

16   **Q.**    Do you know a man named Mr. Quintanilla?

17   **A.**    I do.

18   **Q.**    In point of fact, Mr. Quintanilla was charged regarding

19   50 pounds of marijuana recovered that evening, was he not?

20   **A.**    He was.

21   **Q.**    So what they found in your warehouse was 50 pounds of

22   marijuana from a different person, they had a seizure, and it's

23   your testimony that they came at you with an ounce separately

24   from the 50 pounds that they had seized.  Do I understand you

25   correctly?

JULIUS CERDES - CROSS

1   A.   I'm not sure how you -- I had an ounce of marijuana in my
2   shop, is what belonged to Julius Cerdes.  The rest of that came
3   from Randy Quintanilla's vehicle that Chad Scott led in there
4   without a warrant and dismantled without a search warrant.
5   Q.   Sir, you had an ounce of marijuana and Mr. Quintanilla had
6   500 pounds without a warrant except they had a warrant when
7   they walked in your house, right?
8   A.   Mr. Quintanilla supposedly had 50 pounds in his vehicle.
9   Q.   Okay.  Then you had an ounce of marijuana?
10  A.   In my shop.
11  Q.   Okay.  So I just want to make sure I understand correctly.
12  You had an ounce of marijuana, Mr. Quintanilla had 50 pounds of
13  marijuana, but they were in your shop, correct?
14  A.   It was in his vehicle in my shop without permission.
15  Q.   Then you were arrested for the ounce of marijuana that you
16  had in your shop?
17  A.   Along with the 50 pounds.
18  Q.   Okay.  But the ounce of marijuana was yours?
19  A.   Correct.
20  Q.   You agree that the ounce of marijuana that was in your
21  shop that you talked about on direct --
22  A.   Yep.
23  Q.   -- was yours?
24  A.   Correct.
25  Q.   So it wasn't planted; it was yours.

JULIUS CERDES - CROSS

1   **A.**   The ounce that was in my shop was mine.

2   **Q.**   Okay.  Good.  Now, you also originally filed a complaint

3   with OPR, did you not?

4   **A.**   I did.

5   **Q.**   In that complaint you alleged that Detective Heath

6   actually was the one that planted evidence.  Yes?

7   **A.**   Actually, I witnessed Chad Scott --

8   **Q.**   That wasn't my question.

9   **A.**   -- hold Heath by the arm --

10  **Q.**   My question was:  You filed the complaint, a written

11  complaint, to the Office of Professional Responsibility, did

12  you not?

13  **A.**   I did.

14  **Q.**   In that complaint you said that it was Officer Heath who

15  planted the marijuana, did you not?

16  **A.**   I did.

17  **Q.**   Thank you.  You signed a factual basis before a judge

18  relating to this event, did you not?

19  **A.**   I did.

20  **Q.**   You were told that you had to affirm the actions under

21  penalty of perjury, correct?

22  **A.**   I did.

23  **Q.**   You stood before the judge and you told the judge it was

24  true, the whole truth, correct?

25  **A.**   I did.

JULIUS CERDES - CROSS

1   **Q.**   In that factual basis, they actually talked about the
2   warrant that Agent Scott effectuated at your house, correct?
3   **A.**   That's right.
4   **Q.**   So there was a warrant, wasn't there?
5   **A.**   Hours after he was there.
6   **Q.**   You also affirmed under penalty of perjury that
7   Mr. Quintanilla stated he was delivering marijuana to you that
8   evening, did you not?
9   **A.**   No.
10  **Q.**   Do you remember your statement, your factual basis that
11  you signed and affirmed under penalty of perjury was accurate?
12  **A.**   It was not accurate.  I was under duress.
13  **Q.**   So you lied to the judge?
14  **A.**   I was under duress when I signed it.
15  **Q.**   You lied to the judge?
16  **A.**   I was under duress.
17  **Q.**   Sir, that wasn't my question.  My question was:  You lied
18  to the judge when you signed your factual basis under penalty
19  of perjury, correct?
20  **A.**   I did.
21  **Q.**   Thank you.  In fact, in your factual basis you affirmed
22  under penalty of perjury that Karl Newman was the one who
23  recovered the marijuana in your shop, correct?
24  **A.**   Absolutely wrong.
25  **Q.**   That was a lie too?

JULIUS CERDES - CROSS

1   A.   The marijuana in my shop I have no idea about.

2   Q.   Well, you signed the factual basis and affirmed to the

3   Court --

4   A.   He could have --

5   Q.   I'm not done, sir -- under penalty of perjury that Karl

6   Newman seized four packages of marijuana from the tire which

7   was located on the floor of the shop.  Is that true or untrue?

8   A.   I don't know.

9   Q.   Well, then why did you affirm it to a judge just like

10  Judge Milazzo in this building that that was the truth under

11  penalty of perjury?

12  A.   I was not aware of who exactly found it.  I was only going

13  by what was wrote.  I was not allowed in the shop while the

14  dismantling of the vehicle was under way.

15  Q.   You were there when you entered your plea, weren't you?

16  A.   Yes, I was.

17  Q.   You were there when you signed the document with your

18  attorney, Frank DeSalvo, and Mark A. Miller, Assistant

19  United States Attorney, weren't you?

20  A.   I was.

21  Q.   Thank you.  In point of fact, sir, you will lie to try to

22  cause problems for Mr. Scott, will you not?

23  A.   No, I would not.

24  Q.   You delivered a letter to Judge Milazzo in January of this

25  year, I believe, did you not?

JULIUS CERDES - CROSS

1  **A.**   I did.

2  **Q.**   The letter asserted that you were at a funeral, present

3  physically at a funeral.  Yes?

4  **A.**   That's right.

5  **Q.**   I want to make sure I get this right.  You presently went

6  to a funeral in January of this year where Mr. Scott was

7  present.  Is that true?

8  **A.**   That's right.

9  **Q.**   Where was that funeral?  Where did it take place?

10 **A.**   In Hammond at -- I'm not sure of the address.

11 **Q.**   Tell me the name of the place.  How is that?

12 **A.**   I want to say it's Thompson.

13 **Q.**   Thompson what?

14 **A.**   Thompson Funeral Home.  I'm not sure if that's --

15 **Q.**   Where was that at?

16 **A.**   It's on University Avenue.

17 **Q.**   What's your telephone number, sir?

18         **MR. MIRACLE:**  Objection.  I wouldn't ask that in open

19 court, Your Honor.  I would ask --

20         **MR. GARCIA:**  He gave his address.

21         **THE COURT:**  Can we just go to the next question.

22         **MR. GARCIA:**  Sure.

23 BY MR. GARCIA:

24 **Q.**   Mr. Cerdes, you wrote a letter to Judge Milazzo claiming

25 that you were at a funeral with Mr. Scott and he intimidated

JULIUS CERDES - CROSS

1   you at that funeral, correct?

2   A.   That's right.

3   Q.   You claimed that you were physically present with

4   Agent Scott or Mr. Scott, excuse me, at that funeral.  Yes?

5   A.   Not with him, no.

6   Q.   You were close enough for horseshoes.  You saw him.  Yes?

7   A.   Yes.

8   Q.   How far away from you was he?

9   A.   50 feet, 60 feet.

10  Q.   I'm sorry?

11  A.   50, 60 feet maybe.

12  Q.   What was he wearing?

13  A.   I don't recall.

14  Q.   Do you know somebody named Charity Candiotto,

15  C-A-N-D-I-O-T-T-O?

16  A.   Yes, I do.

17  Q.   Point of fact, sir, you weren't at the funeral.  At

18  9:15 a.m., you had a 5-minute telephone call on January 6

19  with Charity Candiotto where you told her you wanted to set up

20  Agent Scott and asked her to tell you where the funeral was,

21  what he was wearing, and what he was doing, correct?

22  A.   No, that's not true.

23  Q.   You are Junior Cerdes.  Yes?

24  A.   That's me.

25  Q.   You told her not once, but twice on that day asking her

JULIUS CERDES - REDIRECT

1    exactly that, "Tell me why Scott was there because I want to
2    set him up," correct?
3              MR. MIRACLE:  Asked and answered, Your Honor.
4              THE COURT:  I'll allow you to answer.
5              THE WITNESS:  No.
6    BY MR. GARCIA:
7    Q.    An email from Ms. Candiotto and your phone records from
8    her, screenshots, are lying and you're telling the truth.  Yes?
9    A.    Yes.
10             MR. GARCIA:  Okay.  Thank you.  Nothing further.
11             THE COURT:  Mr. Miracle, any redirect?
12             MR. MIRACLE:  Just briefly, Your Honor.
13                      REDIRECT EXAMINATION
14   BY MR. MIRACLE:
15   Q.    Mr. Cerdes, just to clarify, you testified that the drugs,
16   the marijuana, the small amount of marijuana that was found by
17   Chad Scott in your truck, that came from Mr. Charles Tilley's
18   boot; is that correct?
19   A.    Correct.
20   Q.    That was not the small amount of marijuana that you
21   personally had in your shop?
22   A.    No, it was not.
23             MR. MIRACLE:  Thank you, Your Honor.
24             MR. GARCIA:  May I ask one or two follow-ups,
25   Your Honor?

CHARLES TILLEY - DIRECT

1          THE COURT:  No, we are good.

2              Mr. Cerdes, you may step down.

3              Please call your next witness.

4          MR. MIRACLE:  The government calls Charles Tilley.

5          MR. MILLER:  Your Honor, could I take a brief break?

6          THE COURT:  Court will be at recess for 10 minutes.

7          THE DEPUTY CLERK:  All rise.

8          (Recess.)

9          THE DEPUTY CLERK:  Court is now in session.  You may

10   all be seated.

11          THE COURT:  Mr. Tilley.

12                    CHARLES TILLEY,

13   having been duly sworn, testified as follows:

14          THE DEPUTY CLERK:  State and spell your name for the

15   record.

16          THE WITNESS:  Charles Joseph Tilley.

17                    DIRECT EXAMINATION

18   BY MR. MIRACLE:

19   Q.   How do you spell "Tilley"?

20   A.   Sir?

21   Q.   How do you spell your last name?

22   A.   T-I-L-L-E-Y.

23   Q.   Mr. Tilley, I would like to draw your attention to

24   November of 2005.  Were you arrested, at least for a time, at

25   the house of Julius "Junior" Cerdes?

CHARLES TILLEY - DIRECT

1   A.   Yes, sir.

2   Q.   Were you put in handcuffs at that time?

3   A.   Yes, sir.

4   Q.   Were you dealing with a specific officer that night?  Did

5   you know somebody who had arrested you?

6   A.   Yes.

7   Q.   Who was that?

8   A.   Heath Martin.

9   Q.   Had you known Heath Martin for a while at that point?

10  A.   Yes, sir.

11  Q.   Okay.  After a few minutes, was it made clear to you

12  whether you were going to go to jail or not?

13  A.   He was bringing me to the police car.  He put me in the

14  back of a police car.

15  Q.   Did you tell Mr. Martin anything at that point?

16  A.   No.  I just told him that I had something in my boot that

17  I didn't need to take to jail with me.

18  Q.   Okay.  What did you have in your boot?

19  A.   A bag of marijuana.

20          THE COURT:  Mr. Tilley, would you pull your mask up,

21  please.

22          THE WITNESS:  (Complies.)

23          THE COURT:  Thank you, sir.

24  BY MR. MIRACLE:

25  Q.   You said a bag of marijuana?

**CHARLES TILLEY - DIRECT**

1   **A.**   Yes, sir.

2   **Q.**   All right.  What did Mr. Martin do at that time?

3   **A.**   Well, he reached down in my boot and got it out and put it

4   in his pocket.

5   **Q.**   What happened after that?

6   **A.**   I sat there for quite a while.

7   **Q.**   Did you have any other conversations with Mr. Martin that

8   night?

9   **A.**   Yes.

10  **Q.**   What did Mr. Martin tell you during those conversations?

11  **A.**   He told me that the bag of marijuana I had was found in

12  Junior Cerdes' truck.

13  **Q.**   That the bag of marijuana that came from your boot --

14  **A.**   Yes.

15  **Q.**   -- was found where?  Was found where?

16  **A.**   I didn't understand you.

17  **Q.**   Can you just tell me again what he told you.

18  **A.**   He told me that the bag of marijuana I had was found in

19  Junior's truck.

20          **MR. MIRACLE:**  Okay.  I pass the witness, Your Honor.

21          **THE COURT:**  Mr. Garcia.

22          **MR. GARCIA:**  No.  Thank you very much, Your Honor.

23  No, thank you.

24          **THE COURT:**  Okay.  Thank you.

25                  You may step down, Mr. Tilley.

CHARLES TILLEY - DIRECT

1              It's right at 12:00.  The Court is going to take
2    a lunch recess until 1:15.  Court will be at recess until 1:15.
3              THE DEPUTY CLERK:  All rise.
4              (Lunch recess.)
5                             *  *  *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          **AFTERNOON SESSION**

2          **(August 11, 2021)**

3          **THE COURT:**  Court is in session.  You may be seated.

4          Mr. Duree.

5          **MR. DUREE:**  Yes, Your Honor.  Our next witness will

6     be Chris Simon.

7                    **CHRISTOPHER SIMON,**

8     having been duly sworn, testified as follows:

9          **THE DEPUTY CLERK:**  Thank you.  Please be seated.

10         Please speak directly in the microphone and

11    state and spell your name for the record.

12         **THE WITNESS:**  Okay.  Christopher Simon, S-I-M-O-N.

13         **THE COURT:**  Please proceed.

14         **MR. DUREE:**  Thank you, Your Honor.

15                   **DIRECT EXAMINATION**

16    **BY MR. DUREE:**

17    **Q.**   Good afternoon, Mr. Simon.

18    **A.**   Yes, sir.

19    **Q.**   You are going to have to speak a little bit loudly.  With

20    the mask, it can be kind of hard to hear.

21    **A.**   Yes.

22    **Q.**   Mr. Simon, tell me where you are from.

23    **A.**   Houston, Texas.

24    **Q.**   Have you ever interacted with a guy by the name of

25    Chad Scott?

CHRISTOPHER SIMON - DIRECT

1   **A.**   Yes.

2   **Q.**   Do you see Mr. Scott in the courtroom today?

3   **A.**   Yes.

4   **Q.**   Can you tell me where he is sitting and identify what he

5   is wearing.

6   **A.**   He is wearing an orange jumpsuit.

7   **Q.**   Is he at the table over to my right or to my left?

8   **A.**   To your left.

9          **MR. DUREE:**   Your Honor, may the record reflect the

10  witness identified the defendant?

11         **THE COURT:**   So ordered.

12  **BY MR. DUREE:**

13  **Q.**   What was the month and year when you interacted with the

14  defendant?

15  **A.**   It was January of '99.

16  **Q.**   What city and state was that?

17  **A.**   Houston, Texas.

18  **Q.**   Where particularly were you that night in Houston, Texas?

19  **A.**   We was at a club once called Jamaica Jamaica.

20  **Q.**   What were you doing at the club that night?

21  **A.**   We was promoting music for upcoming artists that we had

22  coming out within that year.

23  **Q.**   You say music for upcoming artists.  What label were you

24  working with?

25  **A.**   Rap-A-Lot Records.

CHRISTOPHER SIMON - DIRECT

1    **Q.**    Is Rap-A-Lot a music label in Houston?

2    **A.**    Yes, sir, based out of Houston, Texas.

3    **Q.**    Who is the owner of Rap-A-Lot?

4    **A.**    James Prince.

5    **Q.**    So think to about when you are leaving the club that

6    night.  About what time were you leaving the club?

7    **A.**    After 2:00.  It was after 2:00.

8    **Q.**    Right as the club is closing and everything?

9    **A.**    Yes, sir.

10   **Q.**    Did you notice any type of law enforcement presence in the

11   parking lot as you were walking out?

12   **A.**    Well, as I was walking out, I was hearing people in the

13   parking lot saying that law enforcement was walking around,

14   that it looked like something was about to happen; and as I

15   started looking around, I started noticing them as well.

16   **Q.**    So then what did you do?

17   **A.**    I grabbed the guys that I was with and told them let's get

18   in the van just to, you know, kind of see what was going on.

19   **Q.**    Okay.  Get in the van and you are driving away, right?

20   **A.**    Yes, sir.

21   **Q.**    Were you driving the van?

22   **A.**    Yes.

23   **Q.**    Who was with you?  How many people?

24   **A.**    Two other guys.

25   **Q.**    As you leave the club in the van, tell me what happens

CHRISTOPHER SIMON - DIRECT

1  next.

2  A.   Well, as I'm leaving the club, I notice as I'm leaving out

3  the parking lot, I see a car that was parked across the street.

4  I seen the car come out, turn their lights on as we was turning

5  out of the parking lot.

6  Q.   So when did you do after that, when the car turned its

7  lights on?

8  A.   I just kept going because it was just a regular car.  I

9  kind of noticed it, but I really just didn't pay attention.  I

10  didn't really pay attention until I seen a police car get

11  behind us.

12  Q.   When did you see a police car get behind you?

13  A.   As we was turning out of the club parking lot, I seen a

14  police car and another car pull behind us.

15  Q.   What happened next?

16  A.   We was at the stoplight, and then they just kind of waited

17  until the light turned green.  Once we got on the freeway,

18  that's when the cops cut the lights on.

19  Q.   What did you do once the police lights got turned on?

20  A.   Oh, I pulled over immediately.

21  Q.   What happened?

22  A.   Once I pulled over, that's when we heard on the

23  loudspeaker to pull over at the Newcastle exit.

24  Q.   In case the Court isn't familiar with the geography of

25  Houston, what's the exit that you got onto the highway?

CHRISTOPHER SIMON - DIRECT

1   **A.**   59.  We got onto -- I think the exit we got onto was
2   Kirby, but it was Westlayan, then Newcastle is the exit that
3   they actually told me to exit off of.
4   **Q.**   So the instruction was to go down Highway 59 for some time
5   and take a later exit?
6   **A.**   Yeah.  The exit was about a mile -- a mile down to exit.
7   **Q.**   Did you do that?
8   **A.**   Yes.
9   **Q.**   Now, where they first turned the lights on you as you are
10  getting onto 59, is that a well-lit area or desolate area?
11  **A.**   Yes.  It's a well-lit area because there's a gas station
12  right there on the corner and a lot of club-goers used to go
13  there and hang out.  The reason I pulled off immediately, just
14  in case something would happen, you know, I knew we had people
15  over there that could probably, you know, see what was going on
16  with us.
17  **Q.**   The Newcastle exit where you pulled off at, is that
18  well-lit or is that more desolate?
19  **A.**   Oh, no.  It's not lit, and it's not just that.  Dark.
20  **Q.**   So when you drove down the highway and pulled off at
21  Newcastle, you are there on the feeder road, what happens next?
22  **A.**   Well, once we pulled off over there, I remember the cop
23  come to the car -- the cops come to the car, and I'm asking him
24  what was the problem.  "What are you pulling us over for?"  The
25  cop -- they didn't even know what they was pulling us over for.

CHRISTOPHER SIMON - DIRECT

1   He said, "These guys told us to pull you over."

2   **Q.**   What happened after that?

3   **A.**   Well, once he said, "These guys told us to pull you over,"

4   before I could even really just look out the window, that's

5   when they ran to the van and bum-rushed the van and made all of

6   us get out.

7   **Q.**   Then what happened next?

8   **A.**   That's when he said, "Get along the fence."  He starting

9   yelling about, "This Rap-A-Lot 5th Ward gang shit is over."  As

10   we get on the fence, that's when they start slapping us across

11   the head for a minute.

12   **Q.**   When you say "they," does that include Chad --

13   **A.**   Yes.

14   **Q.**   -- Scott?

15   **A.**   Yes.

16   **Q.**   Okay.  What happened between you and Chad Scott while you

17   were on the fence that night?

18   **A.**   Well, as we were on the fence, they kept yelling.  They

19   had, like, a little pat down.  Once he noticed that I had

20   chains on, that's when he grabbed my chains and said, "Oh,

21   okay."  I had a 5th Ward and Rap-A-Lot piece on.  That's when

22   he said, "This Rap-A-Lot 5th Ward gang shit is over," and he

23   hit me --

24               **THE COURT:**  Wait.  Wait.  What?

25               **THE WITNESS:**  Excuse me?

CHRISTOPHER SIMON - DIRECT

1    **THE COURT:**  You said you had a Rap-A-Lot --

2    **THE WITNESS:**  Chain.

3    **THE COURT:**  Chain.

4    **THE WITNESS:**  A necklace.

5    **THE COURT:**  Oh.  No, I thought you said something

6    else.  I'm sorry.

7    **THE WITNESS:**  Okay.  Yeah, I had the necklace on, and

8    then that's when he said, "This Rap-A-Lot 5th Ward gang shit is

9    over."  That's when he popped me in my mouth.  Well, he

10   actually did it twice.

11   BY MR. DUREE:

12   **Q.**   "He" being Chad Scott?

13   **A.**   Yes.  Chad Scott, yes.

14   **Q.**   Did that cause any harm to your lip?

15   **A.**   Yes.  It bloodied my lip.

16   **Q.**   Let's step back for a second and make clear for the

17   record, you said you had a 5th Ward medallion and a Rap-A-Lot

18   medallion?

19   **A.**   Yes.

20   **Q.**   Rap-A-Lot being the record label you already referenced.

21   **A.**   Yes.

22   **Q.**   5th Ward is what?

23   **A.**   A neighborhood?

24   **Q.**   In Houston?

25   **A.**   Yes.

CHRISTOPHER SIMON - DIRECT

1   Q.   So after Defendant Scott pops you in the mouth with the
2   chain, with the medallion, what happens next?
3   A.   That's when he grabbed it again.  That's when he said,
4   "You guys think you run the streets.  You and James, you guys
5   think you run the streets."  That's when he grabbed the
6   necklace again and popped me in the mouth.  He said, "Yeah,
7   this 5th Ward gang shit is over with."
8   Q.   Then what happened next?
9   A.   Then that's when they kind of had us on the fence for a
10  minute.  Then they took us over to the police car and that's
11  when they put the handcuffs on us.
12  Q.   What happened with the van you were driving at that time?
13  A.   Chad had hopped in the van, him and another guy.  I'm not
14  sure which other DEA it was, but they hopped in the van and
15  told the police to put us in the back of the car and told us --
16  and Chad told the police officer to follow the van.
17  Q.   Where did they take you?
18  A.   I guess to the DEA facility.
19  Q.   Well, tell me where in Houston they took you.  Describe
20  the area of the building.
21  A.   Where at?
22  Q.   Yes.
23  A.   It was close by the Galleria, like off 16th.
24  Q.   As all this is happening, at this point has anyone told
25  you why you're under arrest or anything like that?

**CHRISTOPHER SIMON - DIRECT**

1  A.   Not at all.  We still never got that answer.

2  Q.   To be clear, that night had you been doing anything

3  illegal?

4  A.   No.  Not at all.  Nothing.

5  Q.   Did you have anything illegal in the van?

6  A.   Nothing.

7  Q.   So once you get to what you believe to be the DEA

8  building, what happens next?

9  A.   That's when we get out.  We go through some little metal

10  garages, I think.  I can't really remember, but they were like

11  some metal garages.  Once we get down there, we was getting

12  ready to get out the car, another car had pulled in, but they

13  made us stop.  They told that car to keep going until they got

14  out of our vision.  Then once they got out of our vision,

15  that's when they walked us into the facility and put us all in

16  individual cells and told us to take our clothes off.

17  Q.   Told you to take your clothes off?

18  A.   Yeah.  We was left in our boxers.

19  Q.   So were you placed in a cell just in your -- in a room

20  just in your boxers?

21  A.   Yes, with handcuffs on.

22  Q.   Did you still have your chain on at this time?

23  A.   No.

24  Q.   When did the chain get taken off?

25  A.   I think once we took all our clothes off, that's when we

## CHRISTOPHER SIMON - DIRECT

1  had to take everything off, and they put the cuffs back on us
2  and sat us back in the cell.
3  **Q.**   When is the next time after that you saw the chain?
4  **A.**   On Chad's neck.
5  **Q.**   Describe to me how that went.  You are sitting in the cell
6  in your boxers?
7  **A.**   We are sitting in the cell and he comes back.  He has the
8  Rap-A-Lot chain on and he said, "How do I look in it?"
9  **Q.**   Did you say anything at that point?
10 **A.**   I didn't say nothing.
11 **Q.**   After you're sitting in that cell in your boxers for a
12 while and Chad is wearing your chain, what happens next?
13 **A.**   I think they start walking around talking.  Then that's
14 when they pulled us out and took us outside while they strip
15 searched the van.  We had to sit on the curb in handcuffs.
16 **Q.**   You watched them search the van?
17 **A.**   Yeah.
18 **Q.**   Did you give them permission to search the van?
19 **A.**   No.
20 **Q.**   To your knowledge, did anyone that was with you give them
21 permission to search the van?
22 **A.**   No.
23 **Q.**   After that, what's the next thing that happened?
24 **A.**   Well, we just pretty much -- we sat there for a long time
25 while they searched the van because they took -- like I said,

CHRISTOPHER SIMON - DIRECT

1  they took everything out from top to bottom.  They didn't find
2  anything and set us back in there.  That's when they took us
3  back in there, put us back in the facility.  I can't remember
4  how long, but we sat in there for a while before they gave us
5  our clothes back.
6  Q.    Once you got your clothes back, what happened?
7          THE COURT:  Excuse me.  Are you telling me you were
8  sitting outside in your boxers?
9          THE WITNESS:  Yes.
10 BY MR. DUREE:
11 Q.    So once you get back inside, what happens next?
12 A.    When we go back in the cell, we sit in there for a while.
13 Then that's when they come back and they give us our clothes
14 and they told us put our clothes back on.  Then once we put our
15 clothes back on, that's when they got the squad car, the police
16 car to come back.  They put us in the police car and took us
17 downtown to Harris County.
18 Q.    When you say downtown to Harris County, is that the Harris
19 County Jail?
20 A.    Yeah.  Houston, Texas.
21 Q.    There on North San Jacinto?
22 A.    Yes.
23 Q.    What happened once you got to the Harris County Jail?
24 A.    Once we got there, they banged on the door.  We walked
25 through, you know, where they do the fingerprints, went

CHRISTOPHER SIMON - DIRECT

1  straight through there, then we went through another door.
2  That's when they was yelling at the jailer to open up one of
3  the cells.  Then once they opened up the cell, they threw us in
4  the cell.  They said, "Don't do nothing with these guys until
5  we call you and tell you what to do with them."
6  Q.  What happened to you after that?
7  A.  Well, we stayed there for a while.
8  Q.  How long did you end up sitting at the jail?
9  A.  Well, I stayed there for, I want to say, a day or two
10 because I didn't get out right away.  I had to get a bond.
11 Q.  Did they ever charge you with anything related to that
12 whole incident?
13 A.  No.
14 Q.  Did you ever learn why Defendant Scott and the others
15 pulled you over that night?
16 A.  No.
17 Q.  Do you know as we sit here now why Defendant Scott and the
18 others held you in the holding cell and put you in jail?
19 A.  No.
20 Q.  Once you were released, did you immediately get your chain
21 back?
22 A.  No.  It took months.  It took months before we got
23 anything back, really like almost a year, I think.
24 Q.  Tell me about that.  Did you want the chain that you had?
25 Did you want that back?

CHRISTOPHER SIMON - CROSS

1   **A.**   Yes.

2   **Q.**   Did you attempt to get it back?

3   **A.**   Yes.

4   **Q.**   Do you know why you didn't get it back for months and

5   months?

6   **A.**   I'm not sure.

7   **Q.**   As you look back on this incident now, do you believe that

8   you were treated fairly by Defendant Scott?

9   **A.**   I was treated unfairly.

10  **Q.**   Why do you feel that way?

11  **A.**   Because we were harassed for no reason.  We wasn't doing

12  anything.

13          **MR. DUREE:**  I pass the witness, Your Honor.

14          **THE COURT:**  Mr. Garcia.

15          **MR. GARCIA:**  Thank you, Your Honor.

16                     **CROSS-EXAMINATION**

17  BY MR. GARCIA:

18  **Q.**   Good afternoon, Mr. Simon.

19  **A.**   Good afternoon.

20  **Q.**   Mr. Simon, are you aware of the fact that Chad Scott

21  entered as a member of the academy of the Drug Enforcement

22  Administration in November of 1997?

23  **A.**   No.

24  **Q.**   What month did this all occur?

25  **A.**   '99.

CHRISTOPHER SIMON - CROSS

1   **Q.**   It was 1999?

2   **A.**   Yes.

3   **Q.**   Are you aware that he did not even go out in the field

4   until 1998?

5   **A.**   No.

6   **Q.**   Are you aware that he had no supervisory capacity or

7   capability or authority at all until a little after the year

8   2000?

9   **A.**   No.

10  **Q.**   Are you aware that he was basically an underling, a

11  rookie, a nobody in 1999?

12  **A.**   I didn't know that.

13  **Q.**   Are you aware of the fact that he was not in charge of the

14  stop in 1998 because he was an underling, a nobody at DEA, just

15  fresh on the street?  Did you know that?

16  **A.**   No.

17  **Q.**   Sir, in point of fact, you were pulled over and you were

18  told you were pulled over because the supervising DEA agent,

19  who was not Mr. Scott, had information that you intended to

20  murder an informant about Rap-A-Lot, correct?

21  **A.**   No.

22  **Q.**   In fact, you were told explicitly the reason for the stop

23  was because they suspected that you were going to kill

24  somebody, were you not?

25  **A.**   No.

CHRISTOPHER SIMON - CROSS

1  **Q.**   In point of fact, sir, you had a lawyer named Walter Pink,
2  correct?
3  **A.**   Mr. Pink, yeah, he was my lawyer.
4  **Q.**   He was your lawyer?
5  **A.**   Yes.
6  **Q.**   Chad Scott called Walter Pink five times to return that
7  necklace.  Were you aware of that fact?
8  **A.**   No.
9  **Q.**   Now, you say that they tore your van apart top to bottom,
10 everything in between.  Yes?
11 **A.**   Yes.
12 **Q.**   Certainly they planted something in there, didn't they?
13 Chad Scott planted some marijuana or something, didn't he?
14 **A.**   I don't know about that.
15 **Q.**   Well, did they pull anything out of your van after they
16 planted it?
17 **A.**   They didn't find anything.  They didn't find anything.
18 **Q.**   I didn't ask you if they found anything.  After it was all
19 over, did they pull something out that they planted,
20 Chad Scott?
21 **A.**   You said they planted Chad Scott?
22 **Q.**   I'm asking:  Did Chad Scott plant something in that van
23 where they found nothing?
24 **A.**   No.
25 **Q.**   Okay.  Now, you also filed a complaint, did you not?

CHRISTOPHER SIMON - CROSS

1   A.   Filed a complaint about what?

2   Q.   With the OPR about this?

3   A.   Not to my knowledge.

4   Q.   In fact, James Prince filed a complaint, correct?

5   A.   Could be.

6   Q.   In fact, you never filed a complaint, did you?

7   A.   I mean, I made a statement, yes, I did.

8   Q.   Did you file a complaint with the Office of Professional

9   Responsibility of DEA or any other law enforcement agency?

10  A.   I can't remember.  That was so long ago, sir.

11  Q.   You remember everything else.  You don't remember if you

12  filed a complaint?

13  A.   I can't remember that part.

14  Q.   So it's your testimony you don't recall if you filed a

15  complaint, correct?

16  A.   I can't remember.

17          MR. DUREE:  It's been asked several times already.

18  BY MR. GARCIA:

19  Q.   How long did you stay in jail?  I missed it.  Was it one

20  day or two?

21  A.   Two.

22  Q.   You know there's video cameras all over the jail?

23  A.   Yeah.

24          MR. GARCIA:  Okay.  Thank you.  Nothing further.

25          THE COURT:  Mr. Duree.

CHRISTOPHER SIMON - REDIRECT

1    MR. DUREE:  Very briefly.

2                    REDIRECT EXAMINATION

3    BY MR. DUREE:

4    Q.   Mr. Simon, were you out to kill anybody that night?

5    A.   No.  Negative.

6    Q.   Had you done anything illegal when they --

7    A.   No.

8    Q.   -- did all of this?

9    A.   No.

10   Q.   Did Chad Scott act like a little underling that night when

11   he was dealing with you?

12   A.   He was aggressive, yeah.

13           MR. DUREE:  Nothing further, Your Honor.

14           MR. GARCIA:  May I ask two questions, Your Honor?

15           THE COURT:  No, we are not doing this.

16           MR. GARCIA:  Thank you.

17           THE COURT:  You may step down.  Thank you.

18               Please call your next witness.

19           MR. DUREE:  The next witness will be Special Agent

20   Chip Hardgrave.

21                    RICHARD HARDGRAVE,

22   having been duly sworn, testified as follows:

23           THE DEPUTY CLERK:  Thank you.  Please be seated.

24   Please state and spell your name for the record, and speak

25   directly in the microphone.

RICHARD HARDGRAVE - DIRECT

1      **THE WITNESS:**  My name is Richard Hardgrave,
2  H-A-R-D-G-R-A-V-E.
3                    **DIRECT EXAMINATION**
4  BY MR. DUREE:
5  **Q.**    Special Agent Hardgrave, good afternoon.
6  **A.**    Good afternoon.
7  **Q.**    You were one of the investigators on Defendant Scott's
8  case, correct?
9  **A.**    That is correct.
10  **Q.**    How long have you been investigating the various
11  allegations of misconduct against Defendant Scott?
12  **A.**    Roughly 5 1/2 years.
13  **Q.**    Did you investigate misconduct beyond just what was
14  discussed at the trials in this case?
15  **A.**    Yes.
16  **Q.**    As part of your investigation, did you talk to people who
17  were victimized by Defendant Scott?
18  **A.**    Yes.
19  **Q.**    Were any of these people reluctant to talk about
20  Defendant Scott?
21  **A.**    Yes, they were.
22  **Q.**    Just one or two, or a lot of people demonstrated some
23  reluctance?
24  **A.**    No, quite a few people demonstrated reluctance.
25  **Q.**    Some of these people, have you maintained some degree of

RICHARD HARDGRAVE - DIRECT

1  contact with them over the duration of this proceeding?

2  **A.**   I am.

3  **Q.**   You're aware that Defendant Scott was found guilty of

4  crimes by two different juries, right?

5  **A.**   Yes.

6  **Q.**   Did the fact of those guilty verdicts end the reluctance

7  these people demonstrated to talk about Defendant Scott?

8  **A.**   No, it did not.

9  **Q.**   To your knowledge, why even now do folks remain so

10 reluctant?

11 **A.**   Well, Mr. Scott was a very powerful agent in their eyes.

12 Many of these people were from Tangipahoa Parish.  They are

13 aware that the most powerful man in that parish, Sheriff Daniel

14 Edwards, actually came down to this trial.  They were aware

15 that many of his narcotics detectives testified for Mr. Scott.

16        Those that aren't necessarily from Tangipahoa Parish

17 are also aware that Mr. Scott has many powerful friends in the

18 U.S. Attorney's Office as well as the federal public defenders

19 and within the defense bar.  So what they were telling me

20 specifically is that Chad has a very long reach and that they

21 are afraid if they came down to testify that Chad's vast

22 network of influence would exact some sort of revenge on them

23 for doing so.

24 **Q.**   In some of these discussions, did people also voice any

25 type of fear of Defendant Scott himself?

**RICHARD HARDGRAVE - DIRECT**

1  **A.**   Oh, yes, definitely.

2  **Q.**   Why?

3  **A.**   Again, they believe him to be a very powerful man and he

4  has physically harmed some of them in the past, as well as he

5  has a very large network of informants that they also are

6  afraid of.

7             **MR. DUREE:**  I pass the witness, Your Honor.

8             **MR. GARCIA:**  Your Honor, may we approach?

9             **THE COURT:**  Yes.

10            (The following proceedings were held at the bench.)

11            **MR. GARCIA:**  Your Honor, in an effort to be mindful

12  that we don't have a jury and we don't need all that, all the

13  people that are here, I spoke to the government during a break.

14  It would be my intention to inquire of Mr. Hardgrave relating

15  to an incident that was reported, which is that he lied on his

16  application to DEA about his drug usage history.

17            I understand it was involved that his mother

18  prepared it.  He later corrected it.  I think we are going to

19  stipulate to that rather than do that in open court where

20  people can hear that kind of stuff.

21            **THE COURT:**  Yes, since I already know it.

22            **MR. GARCIA:**  Yes.  We didn't want to make fodder.

23            **THE COURT:**  I know all the circumstances around it.

24            **MR. GARCIA:**  Sure.  We were just trying to avoid

25  fodder and put it in the record.

RICHARD HARDGRAVE - CROSS

1          **THE COURT:**  I appreciate that.

2          **MR. GARCIA:**  Thank you, Your Honor.

3          (End of bench conference.)

4                        **CROSS-EXAMINATION**

5  BY MR. GARCIA:

6  **Q.**    Good afternoon.

7  **A.**    Good afternoon.

8  **Q.**    You have been in law enforcement for how long?

9  **A.**    30 years today.

10 **Q.**    I know that for the last five years or so you have been

11 heavily involved in this particular investigation.  I apologize

12 for my naiveté or lack of understanding of how it works, but

13 was there a time in your FBI career when you were actually

14 making narcotics arrests on the street level or anything like

15 that?

16 **A.**    Yes.

17 **Q.**    Did you use informants?

18 **A.**    Yes.

19 **Q.**    When you used informants, did you always tell them the

20 truth?

21 **A.**    Did I always tell the informants the truth?

22 **Q.**    Yes.

23 **A.**    Yes.

24 **Q.**    You never played one against the other for the purposes of

25 getting them to turn so that you can move up the food chain, as

RICHARD HARDGRAVE - CROSS

1  it were?

2  A.   Not informants, no.

3  Q.   How about criminal defendants?

4  A.   Yes.

5  Q.   In this case Mr. Newman was incarcerated, and there was an

6  agreement that he would get a reduction or consideration for a

7  reduction if he cooperated with you.  Do you recall that?

8  A.   Yes.

9  Q.   You did that with Mr. Newman.  You did that with

10  Mr. Domingue.  You did that with others.  Yes?

11  A.   Correct.

12  Q.   It is an accepted and normal investigatory practice of law

13  enforcement.  Yes?

14  A.   Yes.

15  Q.   In fact, it is one of the pillars of the ability to go

16  ahead and keep moving forward with law enforcement to utilize

17  appropriate means with a defendant to get them to turn on

18  somebody else.  Yes?

19  A.   It is one of the appropriate tools.

20  Q.   One of those means is to perhaps seize property from them?

21  A.   To seize property from the criminal defendant?

22  Q.   Yes.

23  A.   If it was part of their crime.

24  Q.   Also, one of the methodologies is to impress upon a

25  criminal defendant the amount of time they are looking at or

RICHARD HARDGRAVE - CROSS

1    could be looking at depending on how you charge the case and
2    their cooperation?
3    A.    Sure.
4    Q.    That's a long-standing, long-accepted, much-valued law
5    enforcement tool.  Would you not agree?
6    A.    The last part is the purview of the prosecutors, but I
7    agree.
8    Q.    Now, also, when you say Mr. Scott was a powerful agent,
9    his power was derived from his success in arrests.  Would you
10   not agree?
11   A.    Well, I was characterizing it the way they described it.
12   Q.    During the course of your investigation, you looked at
13   everything that was relevant to the investigation, including
14   the many, many successful prosecutions of Mr. Scott based on
15   his arrests.  Yes?
16   A.    I did not review all of his prosecutions, no.
17   Q.    I'm not suggesting all of them, but you certainly
18   suggested some of them and found that he had been deemed to be
19   the most prolific effective Drug Enforcement agent in the area,
20   did you not?
21   A.    That is what I was told.
22   Q.    In fact, he won an OCDETF award for that, did he not?
23   A.    I don't know.
24   Q.    Did you look at all of his prosecutions or only some of
25   them?

RICHARD HARDGRAVE - CROSS

1    A.    I didn't review every prosecution.

2    Q.    For example, did you find out about how much drugs were

3    taken off the street because of Mr. Scott's heroism in the

4    *Baham* case?

5    A.    No.

6    Q.    How about the *Rahsaan Johnson* case?

7          MR. DUREE:   Your Honor, if I may, I'll object.   All

8    this would be perfectly appropriate for allocution, but this is

9    pretty far beyond the scope of anything we discussed on direct.

10         THE COURT:   Mr. Garcia, where are you going?

11         MR. GARCIA:   We are going there and we are done.   I'm

12   not going to go any further on that issue, Your Honor.

13         THE COURT:   So it's just these two cases?

14         MR. GARCIA:   Yes, Your Honor.

15         THE COURT:   All right.   I will allow these two cases.

16         MR. GARCIA:   Thank you, Your Honor.

17   BY MR. GARCIA:

18   Q.    In the scope of your investigation, you did learn that

19   Agent Scott did a lot of good on the streets, did you not?

20   A.    I learned that he would put a lot of people in jail.

21   Q.    A lot of criminals in jail with a lot of drugs.   Yes?

22   A.    His work led to the conviction of many people.

23   Q.    A lot of drugs off the street.   Yes?

24   A.    I can't say that.

25         MR. GARCIA:   Thank you very much, sir.

RICHARD HARDGRAVE - REDIRECT

1          THE WITNESS:  Sure.

2          THE COURT:  Mr. Duree.

3                    REDIRECT EXAMINATION

4    BY MR. DUREE:

5    Q.    Special Agent Hardgrave, Mr. Garcia asked you about the

6    results that Defendant Scott got in this case.  Did you also

7    hear about the methods that he used to get those results?

8    A.    Yes.

9    Q.    Were all of those methods legal?

10   A.    No.

11   Q.    To your knowledge, did those methods involve use of false

12   statements and things like that as well?

13   A.    That is correct.

14          MR. DUREE:  Nothing further, Your Honor.

15          THE COURT:  You may step down, Agent Hardgrave.

16          THE WITNESS:  Thank you, Your Honor.

17          MR. DUREE:  Your Honor, Special Agent Hardgrave is

18   our last witness with one caveat.  You received a letter maybe

19   directly from him, but also through our filing on Monday from

20   Duane Evans, the Interim U.S. Attorney.  We wanted to let you

21   know that if you would like to hear further from him about the

22   impact of this investigation on the office, he is at his office

23   at Poydras Center and is available to come over here and

24   testify or speak to you in person if you so desire.  We just

25   wanted to let you know that.

```
1              THE COURT:  I read Mr. Evans' letter, and I thought
2    it was complete.
3              MR. DUREE:  Okay.
4              THE COURT:  I don't know if I need anything further
5    from him.
6              MR. DUREE:  Thank you, Judge.
7              THE COURT:  Thank you.
8              MR. DUREE:  That's all for us.
9              THE COURT:  Okay.  Mr. Coman.
10             MR. COMAN:  Yes, ma'am.  Judge, our first witness I
11   believe is on line, Mr. Nicholas Dittlinger, who is going to
12   participate, with the Court's indulgence, by video, if that's
13   okay.
14             THE COURT:  That's fine.
15                  Mr. Dittlinger, I know you're participating by
16   Zoom.  I just have a couple of questions to ask.  I see you're
17   in a room at your home.  I'm assuming that's where you are.  Is
18   there anyone in the room with you?
19             THE WITNESS:  No, ma'am.
20             THE COURT:  Thank you.  Do you have any documents in
21   front of you?
22             THE WITNESS:  No, ma'am.
23             THE COURT:  Okay.  Thank you.
24                  You may proceed, Mr. Coman.
25             MR. COMAN:  Yes, ma'am.
```

1                   **NICHOLAS DITTLINGER,**

2  having been duly sworn, testified as follows:

3                   **DIRECT EXAMINATION**

4  **BY MR. COMAN:**

5  **Q.**   Mr. Dittlinger, are you a retired law enforcement

6  professional?

7  **A.**   Yes, sir.

8  **Q.**   Where did you work?

9  **A.**   Drug Enforcement Administration.

10  **Q.**   For how long?

11  **A.**   Almost 21 years.

12  **Q.**   Okay.  In addition to retiring from the DEA, did you also

13  serve in the U.S. Marine Corps?

14  **A.**   Yes, sir.

15  **Q.**   For how long?

16  **A.**   Just shy of 27 years.

17  **Q.**   Do you know Chad Scott?

18  **A.**   I do.

19  **Q.**   How do you know Chad?

20  **A.**   I worked together with him in Houston.  We were

21  acquaintances in college and then I worked with him in Houston.

22  **Q.**   How would you describe Chad Scott's work ethic?

23  **A.**   Chad was the hardest working agent I've ever been around.

24  **Q.**   How would you describe his level of dedication to

25  combating illegal drug trafficking?

NICHOLAS DITTLINGER - DIRECT

1  **A.**   He was the most dedicated individual that I had ever been
2  around.
3  **Q.**   You said that you had worked with Chad back in Houston,
4  Texas; is that correct?
5  **A.**   Yes, sir.
6  **Q.**   Okay.  Did you ever personally witness Chad performing any
7  acts that you would describe as heroic?
8  **A.**   I did.
9  **Q.**   Please tell us about that, please.
10 **A.**   We had an operation one day where we had an undercover
11 agent in a house.  The undercover agent was negotiating a
12 cocaine purchase.  The plan was when the undercover agent saw
13 the drugs that he would exit the house and then we would effect
14 an arrest.
15       Upon the undercover agent seeing the drugs, he told
16 the suspect that he would go out and get the money.  At that
17 time the suspects brandished weapons and told him that he
18 wasn't going anywhere, that he had to get his money in there.
19       At that time Chad exited the vehicle, along with a
20 Houston Police Department sergeant, and entered the residence.
21 Upon entering the residence, he encountered armed suspects
22 which he engaged in gunfire and basically rescued the
23 undercover agent.
24 **Q.**   I may have missed some of that, but did you testify the
25 undercover officer was being held at gunpoint by the drug

NICHOLAS DITTLINGER - CROSS

1    dealers?  Is that right?

2    A.    Yes, sir.  He was being held in there with guns, yes.

3    Q.    Okay.

4    A.    He was told he wasn't going anywhere at gunpoint.

5    Q.    Okay.  Chad Scott ran into that residence; is that right?

6    A.    Correct.

7    Q.    Who was the first through the door?

8    A.    I believe it was Chad.

9    Q.    Did the drug dealers shoot at Chad?

10   A.    I don't remember if they shot at Chad or not, but I know

11   they came up with weapons and pointed them at Chad and at which

12   time he returned fire.  He engaged them.

13   Q.    Did Chad and yourself and others there save that

14   undercover officer's life?

15   A.    In my opinion, yes.

16          MR. COMAN:  No further questions.  Thank you, Judge.

17              Thank you, sir.

18          THE COURT:  Mr. Miracle.

19                        CROSS-EXAMINATION

20   BY MR. MIRACLE:

21   Q.    Good afternoon, sir.  My name is Charles Miracle.  I

22   represent the United States.

23   A.    Yes, sir.  Good afternoon.

24   Q.    Do you know anything about the case that Chad Scott stands

25   convicted of here today?

NICHOLAS DITTLINGER - CROSS

1    A.    I know what I've read.

2    Q.    Have you talked to Chad about it?

3    A.    Yes, sir.

4    Q.    What's he told you he has been convicted of?

5    A.    He never really specifically talked about what he was

6    convicted of.  I mean, he talked in generalities about the

7    case, so I don't really know the specifics.  I read the

8    indictment when it came out.  I know some things have been

9    dismissed, but I can't specifically say what he was convicted

10   of.

11   Q.    So you're not aware of the charges, any of the nine of

12   which he has been convicted?

13   A.    Right off the top of my head, no, sir.  I apologize.

14   Q.    Are you aware that they do involve crimes of perjury and

15   obstruction of justice by asking others to perjure themselves

16   in a federal trial?

17   A.    Yes, sir.

18              MR. MIRACLE:  One moment, Your Honor.

19                   No further questions, Your Honor.

20              THE COURT:  Thank you.

21                   Any follow-up, Mr. Coman?

22              MR. COMAN:  No, Judge.  That's it.

23                   Thank you, sir.

24              THE COURT:  Thank you.  You may leave the call.

25                   Mr. Garcia, anything further?

TYLER SCOTT - DIRECT

1    **MR. GARCIA:**  Yes, Your Honor.  If it please the
2  Court, we would like to call Tyler Scott.
3                         **TYLER SCOTT,**
4  having been duly sworn, testified as follows:
5           **THE DEPUTY CLERK:**  Thank you.  Please be seated.
6  Please state your name and spell it for the record, and speak
7  directly in the microphone.
8           **THE WITNESS:**  Tyler Scott, T-Y-L-E-R, S-C-O-T-T.
9                      **DIRECT EXAMINATION**
10  BY MR. GARCIA:
11  **Q.**   Mr. Scott, are you related to Chad?
12  **A.**   Yes, sir.
13  **Q.**   How?
14  **A.**   He is my father.  I am his son.
15  **Q.**   Do you want to share with the Court your thoughts?
16  **A.**   Absolutely.
17  **Q.**   Would you please do so.
18  **A.**   Sure.  First off, I would like to thank the Court for
19  letting me speak on his behalf.
20  **Q.**   Tyler, go slow and enunciate.  It's hard to understand
21  you.
22  **A.**   Yes.  The last four years have been filled with agony,
23  sadness, anger, yet we still have hope.  We have endured the
24  degradation of my father's pain and the poisoning of his legacy
25  he worked so hard to establish, tainted imagery, and a picture

TYLER SCOTT - DIRECT

1   of corruption and dishonesty when, in fact, my father is a man

2   of honor and courage.  He has been committed to serve in our

3   community, keeping us safe day and night for 20 years.  He

4   truly loved what he did.  He woke up every day with a purpose,

5   to make the world a better place, expecting nothing in return.

6   It showed in his productivity and the awards and recognitions

7   he received, but more importantly the respect he earned from

8   his colleagues.

9         He strived to make our community a better place, but

10  his true motivation was helping others turn their lives around.

11  I can remember being at dinner one night and a man came up to

12  him and told him thank you.  This is man that my father had

13  arrested previously and he had now changed his life and turned

14  his life around.  He was with his wife and three small

15  children, eternally grateful.

16        Another instance I can recall is one of our family

17  friends called dad one day hysterically crying, begging for his

18  help for their son who was using drugs.  My dad spent an

19  afternoon talking to the struggling teenager.  Since that day

20  he has been clean.  He is actually an undergrad trying to go to

21  law school himself.

22        As an orthopedic surgeon, I am on call often, working

23  strenuous hours.  I have missed out on many family events and

24  gatherings and sometimes I start to feel sorry for myself.

25  Very soon after that thought, I think about how much my father

TYLER SCOTT - DIRECT

1    devoted to his profession.

2         I am on call usually a couple times a week, maybe a

3    couple weekends out of the month.  He was on call 24/7.  His

4    phone never stopped ringing.  I used to joke and tell him that

5    we were going to bury him with a phone by his ear.  He would

6    always reply, "Bad guys don't take days off, so neither do."

7    It was what he did.  It's what he loved to do.

8         He was fueled about passion in everything he did.  He

9    carried all that energy and determination into being a father,

10   a husband, a son, a coach, and a friend.  As devoted as he was

11   to his job, he was even more devoted to his family and friends.

12   He made time to coach Chase and I, my little brother's sports

13   teams, and found the energy to yell for the entirety of the

14   games.  I can still hear his voice for all those times I threw

15   interceptions at Jack Salter Stadium.

16        He coached us to become national champion water

17   skiers all the while becoming a national champion himself.  One

18   of the proudest moments of my life was seeing him win that gold

19   medal, seeing how much time he put into our success.

20        He instilled in me the qualities he lived

21   by: honesty; loyalty; being a man of your word; earning

22   everything you get; never cutting corners; never holding a

23   grudge; and loving your family, amongst others.  I am eternally

24   grateful for his influence and molding me into the man I am

25   today.

TYLER SCOTT - DIRECT

1      I cherish the times we have had together and the
2    lessons I learned from him.  I want my children, his
3    grandchildren, to know him just as I have known him.  I want
4    them to learn from him and to be loved by him, spend countless
5    hours throwing the football in the backyard or spend long days
6    out on the lake.  I can't imagine our lives without him in it.
7      I think about my grandmother, Anita, who is now
8    75 years old.  She moved down the street from us after my
9    grandfather passed away.  My father has been helping take care
10   of her ever since.  I think about Thanksgiving and Christmas
11   dinners with him at the table saying grace.  I also recall the
12   times he left those dinners when duty called.
13     I think about my younger brother, Chase, who needs
14   his father at this pivotal time in his life, the age I needed
15   my dad the most.  I think about his niece, Grace, who melts
16   when he walks in the room.
17     Our family has been showered with motivation and
18   encouragement from those close to him.  One of our favorite
19   songs is "Find Out Who Your Friends Are" by Tracy Lawrence.  I
20   think it shows today about how many people showed up, how many
21   people have stuck by his side and remain steadfast in their
22   support.  It's a true testament to the character and the type
23   of man he is.  He is a good man, a kind man, one that does not
24   pose a threat to society.  We will continue to stand by him and
25   support him no matter what the circumstances.  We believe in

1    him.

2           Today my father sits here, 53 years old, with his

3    reputation destroyed.  Chapters of his life have been

4    nullified.  He will never work another day in law enforcement

5    for the rest of his life, a career he so cherished.

6           Your Honor and the Court, we just ask that you look

7    at Chad Scott not only from the opposition's view, but how we

8    see him: as a loving father, a devoted family man, a loyal

9    friend, who has dedicated and put his life on the line for over

10   20 years.  Thank you for your time.

11          **MR. GARCIA:**  Thank you.  I pass the witness,

12   Your Honor.

13          **MR. MIRACLE:**  Briefly, Your Honor.

14                      **CROSS-EXAMINATION**

15   BY MR. MIRACLE:

16   **Q.**   Mr. Scott, one of the --

17          **MR. MIRACLE:**  May I sort of approach the witness,

18   Your Honor?

19          **THE COURT:**  Yes, you may.

20   BY MR. MIRACLE:

21   **Q.**   One of the photos that you submitted to the judge was this

22   photo.  Do you recognize that?

23   **A.**   Yes, sir.

24   **Q.**   Do you remember where that was taken?

25   **A.**   Looks like at the Ski Ranch.

TYLER SCOTT - CROSS

1   Q.   Where is the Ski Ranch?

2   A.   In Covington, Louisiana.

3   Q.   Do you remember when that was taken?

4   A.   I do not.

5   Q.   Is that on your father's property or your grandmother's

6   property?

7   A.   It abuts the neighborhood we live in, yes.

8   Q.   But it's not actually their property?

9   A.   No.

10            MR. MIRACLE:  Thank you.

11            THE COURT:  Mr. Garcia, anything?

12            MR. GARCIA:  May I just have a second, Your Honor?

13            THE COURT:  Yes.

14            MR. GARCIA:  We are done with Mr. Scott.

15            I apologize.  Excuse me, Tyler.

16            We have no further questions of Tyler.  May we

17   approach, Your Honor?

18            THE COURT:  Yes, you may.

19            (The following proceedings were held at the bench.)

20            MR. GARCIA:  Your Honor, there will be two more

21   issues for us if you allow it.  One would be Mr. Scott would

22   like to make a statement.  Then we would like the opportunity

23   to summarize to you at the end, if that's agreeable to you.

24            THE COURT:  I think he is entitled to --

25            MR. DUREE:  Of course.

1          **MR. COMAN:**  It's part of Rule 32.

2          **MR. GARCIA:**  I appreciate it's part of the rule.  I

3    am trying to make sure we put our left foot in front of the

4    right foot here.  That's all I'm trying to do.  If it please

5    the Court, we would just have Mr. Scott speak next.

6          **THE COURT:**  That's fine.  Do you want to do that this

7    afternoon?

8          **MR. GARCIA:**  Yes.  We are ready to go.  Even with him

9    and me, this isn't a lengthy process.

10         **THE COURT:**  Now, Mr. Scott, he would just speak --

11         **MR. GARCIA:**  A statement, yes, Your Honor.

12         **THE COURT:**  Just a statement.  We are not going to

13   put him on the stand or anything.

14         **MR. GARCIA:**  No, Your Honor.

15         **THE COURT:**  I was going to tell you that's not what

16   we are doing.

17         **MR. GARCIA:**  So stipulated, Your Honor.

18         **MR. DUREE:**  That's fine.  Before we get to the

19   allocution part for the day, can we take five minutes?

20         **THE COURT:**  Sure.

21         (End of bench conference.)

22         **DEFENDANT SCOTT:**  I wasn't really prepared to follow

23   my son, so I will try my best.

24              Your Honor, I want to take this opportunity for

25   you to see that I'm not the monster portrayed in the press and

through the government witnesses.  I don't want to dispute the
case, just give you a different perspective of who I am.

As Tyler said, I'm 53 years old.  I'm married to
Michelle.  I'm the proud father of those two boys, Chase and
Tyler.  Chase is 19 years old.  He is a sophomore at
Southeastern.

I'm sorry.

**THE COURT:**  Take your time.

**DEFENDANT SCOTT:**  It's tough to follow your son.  I'm
thankful to be supported by everybody here today: my mom, my
family, former coworkers, colleagues, and many friends who
drove from all over the country to be here today.  I'm ashamed
to be here in front of them.

Your Honor, I grew up in Baton Rouge.  After
high school, I attended Southeastern in Hammond.  I had every
intention of becoming a lawyer.  While at Southeastern, I was
involved in a drug- and gang-related drive-by shooting.  My
vehicle was shot at 27 times and I sustained a gunshot wound to
the head.  It was at that time when I decided to pursue a
career in law enforcement.

I started as a narcotics agent with the
Tangipahoa Parish Sheriff's Office.  After several successful
investigations, I was invited to join the DEA task force.  My
work on the task force led me to be offered a job as a special
agent.

1          My first assignment with DEA was in Houston and,
2    as Nick testified, unfortunately while in Houston I was
3    involved in a shooting.  A shooting occurred when we had an
4    undercover officer in a house with several armed defendants.
5    They actually pulled weapons on him, had him on his hands and
6    knees prepared to execute him.  I was in a vehicle with two
7    Houston police officers actually listening to the body wire as
8    this agent's voice changed six octaves as he feared for his
9    life.
10         I made me and the two Houston guys enter the
11   house that was occupied by 10 other individuals and, after an
12   exchange of gunfire, successfully saved Houston police officer
13   D.K. Bush, who is still a Houston police officer today and was
14   uninjured that day, thank God.
15         I did work hard as a DEA agent, and I truly
16   believe the DEA's mission.  Weekends, anniversaries, birthdays,
17   I missed a lot, but I saw firsthand the devastation that drugs
18   cause in our community on families, on friends that are here
19   today that lost children to overdose deaths.  While I've been
20   incarcerated, my son Chase lost a friend who I coached to a
21   fentanyl death.
22         Over the years I've arrested countless
23   murderers, drug dealers, armed offenders.  I put my life on the
24   line every day.  For the past 16 years, I led this division in
25   arrests.  I was the lead case agent on many significant drug

1    seizures and investigations.  As a result, I earned numerous

2    awards and accolades and obviously made a few enemies along the

3    way.

4            My work at DEA made me the target on several

5    occasions, two documented, of a murder for hire plot which was

6    aimed to prevent me from testifying and continue to investigate

7    these drug traffickers I was investigating.  One guy actually

8    paid an undercover officer money to kill me.  This is just an

9    example of the length people would go to to remove me from

10   their drug trafficking enterprises and be able to continue.

11           Your Honor, as a result of the last several

12   years, beginning with the first newspaper article which named

13   me as a target long before anybody implicated me, my family and

14   I began serving a sentence.  We are obviously convicted in the

15   press and in public opinion.  I lost a job that I love as a DEA

16   special agent one year from being able to retire with my

17   pension.  More importantly, I lost my identity as a person that

18   I am.

19           As you know, I've already served 22 months on

20   house arrest with no ability to help support my family due to

21   the pandemic.  Your Honor, there is no chance at recidivism in

22   this case as my law enforcement career days are over.

23           Judge Milazzo, my fate lies in your hands.  I

24   just hope you will consider the positive things I have done

25   throughout my career and my family, and I beg that you will

give me a second chance at life to remain a gainfully employed, productive member of society while I'm young enough to do so. I appreciate you letting me talk to you.  Thank you.

      **THE COURT:**  Thank you.

      **MR. GARCIA:**  I can't imagine what it's like to follow your son, but following your friend and my son's idol, Tyler, is daunting.

      I think, other than Mr. McSherry, I've probably been a lawyer longer than anybody in the room.  Like you, I had a father who was a lawyer, three uncles, and I suspect during the last couple of years you were probably wondering:  Why are these guys here?  Why is it important enough to be here?  It was because of what Tyler spoke of for me.

      We are here today respectful of the system, respectful of the jury system, respectful of you being kind enough to let me appear in this courtroom as a guest and allow me to advocate, allow us to advocate, and the jury has spoken.

      In a phone call we had not too long ago, you spoke to me about making sure I acquainted myself with the rules, and I hope today I have shown I have and I did.  I assure you that my intention for the next few minutes while I speak is to adhere to it again because respect of the system is important.  The system has given us an opportunity to do our best in advocacy and then it has spoken.

      Mr. Scott and us, all three of us on the

1    phone -- five of us, six of us on the defense team -- are

2    cognizant of that and come here before you with a full

3    recognition of that reality.  The issues and the reference and

4    all those have been done by better legal minds than me and I

5    think they have all been addressed, so what I speak to you only

6    about, Your Honor, are the issues of Mr. Scott and where we are

7    today and the jury's findings.

8              One of the things that I've been challenged to

9    do in the last four or five years in support of Mr. Scott is

10   read everything and kind of go, "Wow."  To be quite candid with

11   you, to be really candid, as you have invited me to be, "Wow,

12   that really happens?  This really happens?"

13             Two words came to me, and I've been struggling

14   with them for the last two weeks about what I would try to

15   suggest, recognizing that two, three, four, five, six, whatever

16   number members of the government have come up here and done

17   their job as professionals and with the integrity of their

18   offices.  What do they see that is different than what I see?

19   Because I don't believe I'm dishonest, and I know they are not.

20             So what did they see?  I would submit,

21   Your Honor, two words come to mind, they are "context" and

22   "perspective."  The behavior for which Mr. Scott has been

23   convicted, I would urge the Court in meting out the sentence to

24   look at it in the context and perspective.  What I have come

25   back to over and over again throughout this process are two

other words, "avarice" and "arrogance."

If you look at the crimes for which Mr. Scott was charged and for which he was convicted, none had personal reward.  None had personal enrichment.  That's why -- and you know this from the bail hearing -- Mr. Scott had to come work for me when he left the DEA.  There was no stash of cash upon which to live.  There was no money he took away from the back of cars, such as Mr. Brown and I believe it was $800,000 in that stop on the way from Atlanta.  There's none of that.

The errors of avarice and arrogance for which my perspective -- which are criminal as determined by the jury, and I'm not trying to go back there, Your Honor.  I'm really not, Your Honor.  They are not self-enrichment actions.  They are actions in avarice and arrogance in furtherance of the goal that Mr. Scott just told you about, which was to get drugs off the street.

It is impossible -- I would suggest we all know from common sense -- for a white Anglo DEA agent to infiltrate gangs, nationality, and color and be a Boy Scout.  That just isn't going to work.  It didn't for him.  What has historically worked are the tactics that Mr. Scott took too far for which he was convicted, that went too far, but they were never personal enrichment.  They were avarice and arrogance.  I'm honestly not telling you anything I haven't preached to him a million times.

That's why I would urge the Court to understand

1   context and perspective because every single thing that Chad

2   Scott did, if you look at any of it, and if you look at it

3   through the most pessimistic eye, Mr. Brown -- Mr. Scott has

4   been convicted of asking Mr. Brown to identify someone he could

5   not identify.  Why?  Two reasons.

6              One, to help make Mr. Brown a more willing

7   participant in arresting drug dealers and getting them off the

8   street.  The right path?  No, Your Honor.  I'm not suggesting

9   it's the right path.  I'm asking you to see the context, the

10   perspective.  Was he trying to pocket money?  No.

11              The truck, for example, took it in Houston but

12   brought it to Louisiana and put it right in the Marshal's

13   Office.  He went right through Washington, you will recall,

14   went through all the proper channels there.  The right action?

15   Absolutely not, but it didn't go home.  It didn't get sold.  It

16   didn't get in his pocket.

17              I'm not trying to ask you to excuse the

18   behavior, Your Honor.  I'm not going to stand here before you

19   and ask that.  The jury has spoken about the behavior.  I'm

20   asking you to give context and perspective to the behavior.

21              When we discussed this, Mr. Coman and I, he

22   said, "The judge is going to ask you, Mr. Garcia, don't you

23   think that hurt the justice system you profess to love?"  My

24   answer, what I told Mr. Coman I would tell you, is yes because

25   any other answer would be not truthful.  But in context and

1  perspective of what and why, the goal was always to rid the

2  streets of narcotics.

3           How do we know that there were good, valued, and

4  important arrests that were done the right way?  Well, because

5  he wasn't charged with all the others after five years of

6  investigation.  There are a lot of law enforcement agents out

7  there who have participated in this investigation in good faith

8  and honor and charged what they believed was chargeable and,

9  frankly, ultimately convicted, but the behavior and the world

10 of Chad Scott is so much more encompassing.  It's so much

11 wider.  It has done so much more good.

12          The fact that criminals don't like Mr. Scott is

13 not a bad thing.  The fact that criminals want Mr. Scott off

14 the street is an understandable thing.  The fact that

15 Mr. McSherry is here again today after twice testifying before

16 Your Honor -- and there are so many others who have come in

17 front of you -- speaks to the fact that there is substance and

18 good there.

19          This is a really hard discussion because it's

20 the first time I've gotten to talk to you without the shield of

21 advocacy on.  Mr. Scott is here to pay as you deem appropriate.

22 He knows it.  He accepts it.  I am here with that same

23 understanding before you, and I'm asking you to see what I see.

24 I'm asking you to see the human being that is a little more

25 than has been presented here.

1              This is a court of law.  These are prosecutors,
2    good men, but their job is to prosecute.  Their job is not to
3    enrapture the whole so that you can see the whole, but rather
4    prosecute the crimes that the man has been charged with.  They
5    have done so fairly, zealously, and well, and obviously
6    effectively and successfully, but Chad Scott is so much more.
7              Since the minute I met him -- I apologize for
8    the euphemism and the colloquialism -- "Arrogant bastard.  Stop
9    being stupid."  I ask you to please look at context and
10   perspective and divorce the arrogance of these bad acts -- for
11   which he has been convicted and for which he will be
12   justifiably punished tomorrow, today -- and recognize that he
13   has been being punished.
14             House arrest was house arrest.  He didn't go
15   anywhere without your leave or the probation department's
16   leave.  He couldn't work.  Financial impact?  Obviously
17   astounding.  He has been incarcerated since his second
18   conviction.  He has been in a jail of its own kind for well
19   over two years now -- going on two years, excuse me.  I would
20   ask you to please consider that time.
21             I would ask you to please consider there is zero
22   chance he is going to do this again.  He is going to go work
23   for a water ski company.  I believe there is a letter to you
24   from Dawn Goode, who has advised that if he was given the
25   opportunity to work, she would gainfully employ him.

1    I'm here to tell you that tomorrow morning, if
2  he were to go out free, he could come work for me again.  I
3  believe in him that deeply.  I believe in his honor that
4  significantly, even in the face of all this.  I think the
5  context and perspective, it is impossible for a successful drug
6  agent to not mirror themselves in that world.  It is not
7  possible.
8    It is not possible to enter into that world, do
9  control buys, UCIs, turn them, get them to cooperate, and play
10  that game with the pristine lenses that we are all looking at
11  this through now.  We are looking through this issue and his
12  history and his life as a DEA agent and Tangipahoa sheriff --
13  by the way, that's the first time I have pronounced
14  "Tangipahoa" properly in my entire four years here.
15    **THE COURT:**  Almost got it.
16    **MR. GARCIA:**  I'm getting there.  I'm getting closer.
17    When we look through this, we see this
18  black-and-white spectrum that understandably the prosecutors
19  have brought this case in, which is:  "Here.  He done bad."
20  The jury has found he has done bad, and there's a righteous and
21  a fair response to that.  However, the universe is he has done
22  so much better.  He has taken so much off the streets.
23    No, they don't like him because he busted them.
24  He did not do it the wrong way or we would have heard a cascade
25  of people through here.  It would have never ended.  These

1  halls would have been piled all the way down and we would have

2  heard them for three days.  Instead, we heard a man who clearly

3  has a grudge, Mr. Cerdes, and we heard Agent Hardgrave.  I

4  don't doubt Agent Hardgrave's representations to you at all,

5  Your Honor.  I'm not suggesting that.  I'm saying there's a

6  bigger universe, and even Agent Hardgrave conceded that.

7           When you go back and think about where you will

8  go, I am literally begging you to look at the whole world of

9  good and bad and have context and perspective.  So many would

10 not have become so invested -- certainly not me, I'm not

11 stupid -- if there wasn't just a world of good there.  I would

12 ask you to please focus on that.

13           I want to again thank you for letting me be a

14 guest in your courtroom.  We certainly tried very hard to plan

15 and adhere to where you wanted us to go in this process.  Thank

16 you so much.

17           **THE COURT:**  Thank you.

18           Mr. Duree.

19           **MR. DUREE:**  Yes, Your Honor.

20           Your Honor, the government is asking now for a

21 sentence to be imposed of 235 months.  That corresponds to the

22 top of the guidelines as calculated.  In the alternative, even

23 if you were to find that a different guideline calculation,

24 lower guideline calculation is appropriate, we would then ask

25 for an upward variance to 235 months and the reason is this:

The harm caused by Defendant Scott's actions is staggering.

The defendant hooked himself and the power of the badge and the gun, used his power to lie and to steal and to hurt people over and over again.  At trial we proved several individual instances of his corruption.  Here today at sentencing, through a few additional witnesses and our sentencing memo, we identified for your consideration several additional instances of his corruption.  They tarnish the entirety of his DEA career.

Now, these are so important because it is sacrosanct that the rule of law has to apply equally to all people.  It's our belief in that principle and our efforts to make that principle a reality that set our country apart, that make it something special.  The police don't get to make the law, rather they enforce the law while being subject to it just like everyone else.

In the statement we just heard from Mr. Garcia, it seems that the excuse here is:  "Well, the defendant's tactics worked.  He just went too far.  The ends justify the means."  That's wrong.  That can't be right.  That's not what our system is about.  That is impossibly, overwhelmingly dangerous and corrosive to the rule of law that your job stands for, that my job stands for, this whole courthouse stands for.

That statement he just went too far, it made me think of C.S. Lewis.  In one of his books, he wrote that the

1   safest road to hell is the gradual, the gentle slope.  It takes

2   you there little by little.  I worry that that is what we are

3   getting through the defendant's actions.

4                    Mr. Garcia is suggesting and even

5   Defendant Scott himself suggested, "It's okay.  I was a good

6   guy taking bad guys off the street," but he is doing it the

7   wrong way.  He is hurting the system.  He is disrespecting the

8   rule of law.  He is corroding the very things that this Court

9   stands for.  Every instance of perjury, every fist to the face

10  of an arrestee, every dollar taken out the wallet of some

11  arrestee, that's another crack in the foundation of the rule of

12  law.  It's corrosive to the very thing that we hold most dear

13  in this country because it's our faith in the rule of law that

14  allows the whole system to work.  Without that equality,

15  fairness, everything that this Court embodies, it's nothing.

16                   So when we think about the defendant's

17  culpability, I am not going to dispute for a second that he is

18  a hard worker, and it sounds like he did do some heroic things.

19  I do not dispute that for second.  But this idea that he is a

20  good guy trying to protect us from bad guys and somehow that

21  means he shouldn't be punished, that isn't right here.

22                   First, that good guy/bad guy distinction, it's

23  my respectful submission that the truth is a whole lot more

24  nuanced than that.  What we have proven at the trials and

25  emphasize again here today is that the defendant repeatedly

victimized people and subverted the rule of law for greed, for
ego, and for personal hubris.

　　　　　　To that point, Mr. Garcia mentioned there was no
personal gain.  There was the money taken from wallets.  There
was the money taken from seizures.  There was the nice truck
that he got Frederick Brown to buy him the defendant got to
drive around.

　　　　　　There's also the personal gain that's not
monetary.  There's the inflation of your ego.  There's the
feeling of pride when you are the biggest, baddest guy in town.
Hubris, Your Honor, that's personal gain as well.  Whatever the
defendant's intentions were, the severity and the seriousness
of his corruption remains the same because one thing that is
absolutely true is this:  When the guardians of the system
choose instead to exploit it, they become the most dangerous
gangsters of all.

　　　　　　That's what Defendant Scott proved himself to
be, a brazen criminal who, despite the good that he did, hid
behind the badge and the gun to hurt people and to make himself
seem big.  He scared his victims by claiming an ability to
manipulate the entire judicial system to his desires.  He lied
and threatened just to intimidate.

　　　　　　Remember Frederick Brown.  Defendant Scott told
him, "The prosecutor wants you to buy this truck for me."  The
prosecutor took the stand and said, "I never said any such

1    thing."  It's a manipulation.  It's false.  Many of the people
2    that he manipulated were guilty.  They were not innocent.
3    There were a lot of drug dealers, but a point that's worth
4    emphasizing is that in the moment they are vulnerable.
5              Think about Junior Cerdes.  The defendant
6    planted weed in his truck.  Mr. Cerdes had weed in his house
7    already.  He was guilty.  There was a crime, but
8    Defendant Scott exploited his vulnerability, put marijuana in
9    his truck to ratchet up a sentence to hurt him in ways that he
10   did not deserve, to go beyond what the law requires, to impose
11   some individual sense of frontier justice on this guy.  That is
12   not how things should work in this country and in this system.
13             Here the defendant's guideline range as it's
14   calculated right now, it largely matches that of an admitted
15   heroin dealer.  That's right.  That's correct.  That's good.
16   That's how it should be because the defendant's conduct was
17   more harmful and more corrosive than that of any drug dealer,
18   and I will tell you why.
19             The criminal justice system contemplates the
20   existence of the drug dealer.  It provides mechanisms to ensure
21   the public is safe from that drug dealer.  The drug dealer's
22   crimes fit within the system.  When the drug dealer is
23   prosecuted and the drug dealer is found guilty and the drug
24   dealers go to jail, that's the system working.  That's rule of
25   law.  But when the cop lies and cheats and abuses people, that

cop is taking actions to corrode the entire system, and it
undermines the very foundation of the rule of law.

It hurts everyone, every single person who
relies on the system, and it damages faith in the system as a
whole.  It indicates that cops can't be trusted, that cops are
dirty, that the whole system is unfair.  So in that way the cop
who knowingly subverts the system of justice causes more harm
than the drug dealer that he wants to stop because the dirty
cop undercuts the entirety of the rule of law.

A quick word about the guideline calculations
since I'm on that point.  The defense put Rachel Pierce on the
stand to talk about the guidelines.  I will just quickly note,
as Your Honor remembers, she was paid by defense counsel.  She
has an incentive to say whatever they want.  In the end, when
cross-examined about her application of the guidelines, her
answers were often, "I need more facts."  "I need more facts."
I submit to you that that is "expert speak" for the straight
answer would hurt them.

Some of her conclusions, like her conclusion on
direct about the grouping application not applying, they are
just wrong.  They are demonstrably wronged based on
black-and-white words in the guidelines.  The high guideline
range here was correctly calculated by the probation officer
who is in this courtroom today and it should be applied.  It is
warranted because, again, Defendant Scott did a staggering

1   amount of damage.

2               Think for a second about the chart of affected

3   cases that we transmitted to you along with our sentencing

4   memo.  In that, dozens of cases were identified, handled by

5   this U.S. Attorney's Office in New Orleans and also recusal

6   cases that were sent to the El Paso, Texas, to the Western

7   District of Texas.  These were dozens of cases in which

8   Defendant Scott had a hand that had to be sold cheap.

9               Some of these were sold for just a fraction of

10   what the PSR recommended and others were dismissed outright

11   like Jorge Perralta's, Paul Norris.'  Criminals who committed

12   severe crimes and jeopardized public safety got unbelievably

13   good deals that wouldn't have been contemplated otherwise.  Why

14   did that happen?  Because of the defendant's corruption,

15   because the stain of his corruption blemished all the cases

16   that he touched.

17               Like Greg McDonald said when he testified here,

18   prosecutors have ethical obligations and burdens of proof.

19   When the integrity of your agents are fundamentally called into

20   question, you don't have a case.  Chad Scott's lack of

21   integrity in the way that he investigated and prosecuted his

22   cases, the corners he cut, the laws that he broke, they

23   affected every single case that he touched.  They had to be

24   dismissed because, again, the result matters.  But the sanctity

25   of the rule of law, it matters more.

To that same point, the defense has emphasized repeatedly that Defendant Scott was unusually productive, he was a huge producer of cases, and that is true.  But he was so uncommonly productive because he was so consistently cheating, and cheating is not success at all.

Think about some of the evidence that was introduced at trial and at sentencing.  The defendant got his results by engaging in intimidation through violence.  He knocked the guy's teeth out, as mentioned in the sentencing memo, knocked the guy's teeth out by body-slamming him, while handcuffed, to the floor.  He punched people in handcuffs.  He popped Chris Simon in the mouth, as part of an illegal arrest, with his own chain.

He coerced witnesses to lie.  He took personal property.  He mishandled evidence at every single point.  He corrupted the system, he corroded the system, and he broke every rule in the book to get whatever he thought the approximation of justice ought to be, but that is not at all how the system works.  Again, that is dangerous.

Through this he earned a reputation, as was adduced at trial, as the White Devil.  He was a person who always got what he wanted and not to be refused.  He couldn't lose.  He had to maintain his street cred even when that meant cheating, lying, cooking up evidence on Jorge Perralta to manufacture convictions.

1           As far as taking drugs off the street, just a
2   quick rebuttal to that.  I don't doubt for a second that the
3   defendant took some drugs off the street, but the defendant
4   also let drug dealers like Fred Brown sell drugs in their town
5   whenever they wanted as long as they brought cases to the
6   Eastern District of Louisiana so the defendant could get his
7   stats.  The drug dealer in that arrangement is safe to poison
8   his community as long as he pays tribute to Chad Scott whenever
9   Chad Scott wants it.  So in those instances the defendant isn't
10  stopping drug trafficking; he is enabling it.  When he did
11  this, he got cash, made the office look good, and everyone was
12  satisfied.  It was a fraud and it hurt the public.
13          This idea defense counsel is presenting that he
14  protected the community, let's be clear about what he was
15  doing.  He was protecting the community by lying, cheating, and
16  breaking every law whenever he wanted.  That's not protection
17  of the community; that's victimization.  That's not being a
18  guardian; that's a predator.
19          He was a predator who was committing crimes
20  prolifically because, again, if we think about what was
21  presented at trial, there's overlap showing you that all of
22  these crimes, that so much of this was happening at the same
23  time.  He is breaking many laws all at once.
24          In 2014, when he gets Fred Brown to buy him a
25  truck, at the same time he is pilfering money from wallets.

1    That's happening in the same period.  In 2016, when the
2    defendant is cooking up testimony against Jorge Perralta and
3    perjuring himself, right at that same time he is working with
4    Rodney Gemar and Karl Newman to remove evidence so they don't
5    get caught and to steal money from wallets to pay Garry Jordan.
6    Those are multiple crimes all at once.
7                As to Defendant Scott's family, I will not for a
8    second make light of the pain that his family is enduring, but
9    it bears mentioning that we are here because of the choices
10   that he made.  They are suffering because of the defendant's
11   decisions.
12               In part, I stand before you today as an advocate
13   for those you didn't hear from, an advocate for those who don't
14   have a voice, the people who were traumatized and scared and
15   victimized by Defendant Scott.  You should think about his
16   family, but I would encourage you also to think about the
17   mother who cried when Special Agent Hardgrave interviewed her
18   because Defendant Scott had so savagely beaten her boy that she
19   couldn't recognize him, the same mother who didn't want to talk
20   because she believed that Defendant Scott was going to come
21   back to kill her son.
22               I would have you think about the individuals who
23   spent time in prison that they didn't deserve, individuals who
24   had their sentences ratcheted up and spent more time behind
25   bars because the defendant falsified testimony or planted

evidence.  I would have you think about the individuals who had their money stolen, property destroyed, their lives derailed. Think again about Kevin Whittington.  All he wanted was the picture of his son who had passed away.  It's gone.

You have received letters from the defendant's friends, and I will just mention there are a lot of them. Those people, most of them, did not know him in his professional capacity.  Those people knew one side of him, and the other side that has to be acknowledged is the side that hurt so, so many people, the fact that to this day many of the defendant's victims are reluctant to publicly voice their concerns because they are scared of this same network of friends.  They are scared that they are going to incur his wrath or his friends' wrath if they cross him.  This network scares people who know what Defendant Scott did in the past and continue to fear what he is capable of.

To that point, what he remains capable of, there is something that you did not hear at all from Mr. Garcia or Defendant Scott, and that's an acceptance of responsibility. It didn't happen at all; no acceptance of responsibility, no acknowledgment of the crimes, no acknowledgment of the harm done, no seeming understanding that all of this is wrong and corrosive and hurtful.

In total, the defendant's actions, as we have proven at trial and discussed here at sentencing, obliterated

1  the rule of law.  He brazenly blew through every procedural
2  guardrail that could have controlled his conduct.  In doing so,
3  he hurt a lot of people.  He hurt the reputation of the DEA and
4  of law enforcement, and he crippled the administration of the
5  rule of law.  He did his job in a way that weakened the
6  criminal process and made a mockery of the principles for which
7  good law enforcement stands.  Those are crimes that have caused
8  massive damage, and those are crimes that are almost
9  indescribably dangerous to the fair administration of justice
10 and to the rule of law.  So for those reasons we are asking for
11 a sentence of 235 months, which corresponds to the top of the
12 guidelines.
13          **THE COURT:**  As I indicated this morning, we have had
14 a great deal of information provided today.  We have had
15 additional argument regarding the guideline calculation.  I
16 also indicated this morning that because of the very nature of
17 the request that we maintain the previously set sentencing
18 date, things came in rather late.
19              I am going to recess until 8:00 a.m.  Tomorrow
20 morning at 8:00, I will impose sentence.  I will rule on the
21 objections at that time.  I will not hear any further argument.
22 Mr. Scott has had an opportunity of allocution.  I've heard
23 argument from both parties and the witnesses that were
24 presented at sentencing.  The Court is at recess until
25 8:00 a.m. tomorrow morning.

1          **THE DEPUTY CLERK:**  All rise.

2          (Proceedings adjourned.)

3                    * * *

4                **CERTIFICATE**

5          I, Toni Doyle Tusa, CCR, FCRR, Official Court

6   Reporter for the United States District Court, Eastern District

7   of Louisiana, certify that the foregoing is a true and correct

8   transcript, to the best of my ability and understanding, from

9   the record of proceedings in the above-entitled matter.

10

11

12                         */s/ Toni Doyle Tusa*
                           Toni Doyle Tusa, CCR, FCRR
13                         Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25